[Civ. No. 22427. First Dist., Div. One. Apr. 1, 1966.]

HARDWARE MUTUAL CASUALTY COMPANY, Plaintiff and Appellant, v. HOME INDEMNITY COMPANY et al., Defendants and Respondents.

W. W. Kitchel and D. W. Brobst for Plaintiff and Appellant.

Hagar, Crosby & Rosson, Justin M. Roach, Jr., Joseph Landisman, and Joseph W. Jay, Jr., for Defendants and Respondents.

SULLIVAN, P. J.—In this action for declaratory relief we are called upon to determine whether defendant Frederick Bowens was an additional insured under the automobile policy issued by plaintiff to Bowens' aunt and uncle. As will appear we have concluded that he was and that the judgment of the trial court declaring plaintiff's obligations to Bowens under said policy should be affirmed.

The background facts are not in dispute. On June 25, 1961, Bowens, while driving a 1940 Chevrolet owned by his cousin

Lonnie Madden, was involved in a collision in Berkeley with an automobile driven by Thomas Gee in which Marian Gee was riding. As a result of the collision, the Gees were injured.

At the time of the above accident there was in effect a family automobile policy issued by plaintiff Hardware Mutual Casualty Company (Hardware) on which Cornelius Jones and Carrie Etta Jones, his wife, were the named insureds.[1] Carrie Etta was Bowens' aunt. ▇ In pertinent part this policy provided in Part 1 thereof that among the persons insured were: "(b) With respect to a *non-owned automobile,* . . . (2) any *relative,* but only with respect to a private passenger automobile or trailer, provided the actual use thereof is with the *permission* of the *owner;* . . ." (Italics added.) In the "Definitions" under Part I the policy stated that "'relative' means a relative of the *named insured* who is a *resident* of the same household." (Italics added.)

On June 25, 1962, Thomas and Marian Gee commenced an action in the Superior Court of Alameda County naming Bowens and Madden as defendants and seeking damages in the sum of $55,000. On February 1, 1963, said defendants tendered the defense of said action to Hardware upon the ground that Bowens was a relative and resident of the household of the named insured. Hardware refused the tender of defense and on April 1, 1963, commenced the instant action for declaratory relief which is the subject of the appeal at bench.[2]

The trial court found, so far as is here pertinent, that Hardware's policy was in full force and effect at the time of the aforementioned accident; that the defense of the action filed by the Gees had been tendered and refused as stated above; that at all times material Bowens was a nephew of Carrie Etta Jones and as such was a relative of the named insured under the terms of the policy; that on June 25, 1961, Bowens was a resident of the household of Carrie Etta Jones and Cornelius Jones under the terms of the policy; and that at the time of the collision on said day the actual use by Bowens of Madden's Chevrolet was "with the permission and consent" of

---

[1]Although Cornelius was the only person named on the first page (Item 1), the policy stated that "named insured" meant not only such person but also "includes his spouse, if a resident of the same household." The court found both Mr. and Mrs. Jones were named insureds.

[2]Hardware's complaint named as defendants Home Indemnity Company (Home), insurance carrier for the Gees, Thomas and Marian Gee, Bowens, Madden and Cornelius Jones.

Madden. The court concluded that Bowens was an additional insured under the policy and that Hardware was obligated to pay on behalf of Bowens all sums recoverable against him by the Gees and to defend and pay all costs incurred by Bowens in the defense of action filed by the Gees. Judgment was entered accordingly. This appeal followed.[3]

Hardware contends before us that Bowens was not an additional insured under the terms of the policy because (1) he was not a resident of the household of Mr. and Mrs. Jones and (2) he was driving a non-owned automobile without the permission of the owner Madden. Basically these contentions present questions on the sufficiency of the evidence.

To resolve the first question we must first determine what is meant by the phrase "resident of the same household." On this subject, the parties take divergent positions. Hardware argues that the evidence must show that Bowens "was a member of the family living at that home permanently as one unit headed by Cornelius Jones for the promotion of their mutual interest and social happiness." Justification for this position is sought in *Island* v. *Fireman's Fund Indemnity Co.* (1947) 30 Cal.2d 541 [184 P.2d 153, 173 A.L.R. 896]. Defendants[4] argue that the critical phrase has a broader meaning than merely "member of the family" or "member of the household." As defendants see it, Hardware's policy merely requires that the relative reside in the household, not that he live there permanently as a member of the family. We agree.

Essentially, therefore, we face a two-fold problem. Initially, it is one of interpreting the particular provision of the insurance contract; secondarily, it is one of determining whether there is sufficient evidence in the record to make operative the policy provision as thus interpreted. On the first phase of the problem we are not unmindful of the following rule of construction set forth in *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914] : "It is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. [Citations.] If semantically permissible, the con-

---

[3]The judgment is thus favorable at least to Home, the Gees, Bowens and Madden. Home and the Gees have jointly filed a respondents' brief herein. Respondents Bowens and Madden have adopted said brief by reference. (Cal. Rules of Court, rule 14a.) *Respondent* Cornelius Jones purports to join in the brief of *appellant* Hardware.

[4]That is those defendants filing or adopting the respondents' brief herein. (See fn. 3, *ante*.)

tract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. [Citation.] If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against [citations], the amount of liability [citations] or the person or persons protected [citations], the language will be understood in its most inclusive sense, for the benefit of the insured." (In accord: *Southwestern Funding Corp.* v. *Motors Ins. Corp.* (1963) 59 Cal.2d 91, 94 [28 Cal.Rptr. 161, 378 P.2d 361]; *Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27, 32 [17 Cal. Rptr. 12, 366 P.2d 455]; *Exchange Cas. & Surety Co.* v. *Scott* (1961) 56 Cal.2d 613, 619 [15 Cal.Rptr. 897, 364 P.2d 833]; *Prickett* v. *Royal Ins. Co. Ltd.* (1961) 56 Cal.2d 234, 237 [14 Cal.Rptr. 675, 363 P.2d 907, 86 A.L.R.2d 711]; *Wildman* v. *Government Employees' Ins. Co.* (1957) 48 Cal.2d 31, 35-36 [307 P.2d 359]; *Continental Cas. Co.* v. *Hartford Acc. & Indem. Co.* (1963) 213 Cal.App.2d 78, 89 [28 Cal.Rptr. 606].) Under the foregoing principles we must therefore construe the policy provision under examination so as to give Bowens "the benefit of any reasonable interpretation that may bring him within its coverage." (*Cal-Farm Ins. Co.* v. *Boisseranc* (1957) 151 Cal.App.2d 775, 781 [312 P.2d 401].) To paraphrase our observation in *Cal-Farm*, the precise question which we face in the instant case is whether or not under any reasonable interpretation of the policy Bowens was a resident of the household of Mr. and Mrs. Jones at the time of the accident.

In *Moore Shipbuilding Corp.* v. *Industrial Acc. Com.* (1921) 185 Cal. 200, 207 [196 P. 257, 13 A.L.R. 676], it was said: "There is little to be gained by reviewing the numerous definitions given by the courts and lexicographers of the words 'family' and 'household.' They mean different things under different circumstances. . . . [T]he word 'household' *is variously used to designate people, generally, who live together in the same house, including the family, servants, and boarders, or it may be used as including only members of the family relation.*" (Italics added.)

In *Island* v. *Fireman's Fund Indemnity Co., supra,* 30 Cal.2d 541, 547 the court said: "One of the definitions of the word 'household' given in Webster's New International Dictionary is, 'Those who dwell under the same roof and compose

a family; a domestic establishment.' The courts have noted that the term may have different meanings under different circumstances. [Citations.]'' The court thereafter quoted from *Moore Shipbuilding* the excerpt set forth by us above.

In *Cal-Farm Ins. Co.* v. *Boisseranc, supra,* 151 Cal.App.2d 775, this court had occasion to interpret the terms ''resident'' of the ''household'' as used in a comprehensive liability policy extending coverage to such a person. It was there said: ''These quoted terms have no absolute meaning. Their meaning may vary according to the circumstances. [Citations.] An important factor is to ascertain the purpose of the terms of inclusion and exclusion. [Citations.]'' (P. 781, citing *inter alia* both *Moore Shipbuilding* and *Island.*) We also pointed out in that case that ''insofar as the cases involve insurance policies, they can be roughly divided into cases involving policies excluding from coverage of the policies members of the insured's household, and those extending coverage to such persons. Both attempt to apply the rules of construction above discussed. As a result, in the extension cases the questioned terms are broadly interpreted, while in the exclusion cases the same terms are given a much more restricted interpretation. This is necessary because in both situations the courts favor an interpretation in favor of coverage.'' (P. 782.) Finally, after a discussion of a number of cases, our opinion concluded: ''These cases illustrate that the interpretation of the terms involved is not fixed but varies according to the circumstances of the case. They also demonstrate that most courts will interpret the terms so as to extend the coverage if this can be done under any reasonable interpretation of the facts.'' (P. 783.)

The evidence in the instant record viewed in the light most favorable to the respondents (*Marshall* v. *Marshall* (1965) 232 Cal.App.2d 232, 236 [42 Cal.Rptr. 686] and cases there cited) discloses the following relevant facts: In the ''early 1950's,'' for two years while he was attending school,[5] Bowens lived with Mr. and Mrs. Jones in their home in Richmond. His parents were in Blythe but were separated. He later returned to Blythe, resumed school there but then enlisted in the Navy. He was discharged from the service in August 1959 whereupon he returned to Richmond once more to live with his aunt and uncle on Helms Street. He stayed there ''a little over three months'' when he moved to Wood Street. He stayed at the latter address for another ''two or three months'' where-

[5]At the time of the trial (April 1964) Bowens was 25 years old.

upon in early 1960 he moved to an apartment on 34th Street in Oakland. This apartment he shared with his cousin Madden; later on, a third person joined them. Bowens maintained that he, Bowens, lived there continuously until April 1963.

Mr. Jones operated a service station and garage in Richmond. At some point he gave his son Roscoe a 1940 Chevrolet, the car which Bowens was driving when involved in the accident on June 25, 1961. This car apparently remained registered in the name of the senior Jones. In March 1961, two months before he was to depart for the Air Force, Roscoe sold the car to Madden, Mr. Jones making the necessary transfer from his name to Madden's. In May 1961 Roscoe Jones then departed for the service, making available for occupancy one of the Joneses' two bedrooms, the Joneses themselves continuing to occupy the other.

After Madden had the Chevrolet for awhile, it stopped running and was placed on blocks at Mr. Jones' service station and garage in Richmond. Bowens had "helped out" at the garage while he was living in the Joneses' house in the fall of 1959. Over a period of approximately two weeks before the accident in 1961 Bowens was at the service station "tinkering" with the car in an attempt to get it running again. At this time Bowens was unemployed.

Mr. and Mrs. Jones, as well as Bowens, testified to the effect that at the critical time Bowens was not living in the Joneses' residence in Richmond but in the apartment in Oakland with Madden. Bowens himself admitted that he slept at his aunt's house on the night before the accident but denied that he had necessarily done so on previous nights while he was tinkering with the Chevrolet,[6] saying that such "rare occasion might happen every six months." Apparently the trial judge chose not to accept such testimony.

On the other hand, Madden, called by defendant Home under Code of Civil Procedure section 2055, testified that, although beginning in 1960 he had been sharing the Oakland apartment with Bowens, he did not see much of Bowens during June 1961 because the latter was staying with his aunt and uncle in Richmond. According to Madden, Bowens "said he was going out to Richmond, he was going, he would be helping

---

[6]He testified: "No, not necessarily. I mean, I would say I'd come by and just stop in, sometimes I'd be out there in Richmond 3:00 or 4:00 o'clock in the morning, I would come in, be setting up there, I wouldn't go to bed, I would be sitting there at 4:00 o'clock talking to her son sometimes."

working around the shop and he would be staying out there for a while, but he had his key to the apartment; when he came in sometimes during the week, he would come in and spend the night, sometimes on the weekend.'' Madden related that Bowens was ''working around'' his uncle's service station and had told him he thought he could fix the Chevrolet. While the testimony is not too clear, Madden stated that Bowens had some clothes with him when he started staying in Richmond, although some of his clothes were still in the apartment.

At the time of the accident Bowens was driving in the Chevrolet from Richmond to Berkeley to see his girl friend. After the accident[7] he was taken to Herrick Memorial Hospital presumably for emergency treatment. From there he telephoned his uncle to ''pick him up'' and the latter brought him back to the Joneses' house in Richmond. Although he sustained no serious injuries, he lived in the Joneses' house for a period of time thereafter, varying from two days to two weeks according to the testimony. Madden testified that Bowens did not return to the apartment until two weeks after the accident.

William Rumford, the Berkeley police officer investigating the accident, testified that when he asked Bowens where he lived the latter gave him the Helms Street address in Richmond and gave him a telephone number with a Richmond exchange. It is reasonably inferable that Bowens had the Helms Street address on his driver's license since Rumford at the time asked to see his driver's license and issued a traffic citation to him.[8] Bowens admitted he had given the hospital a telephone number which was that of his aunt and uncle, although when shown the emergency hospital record containing his name and the Helms Street address he could not recall whether he had told the hospital authorities that his address was at Helms Street. William Ulp, a licensed investigator, personally contacted Bowens at 5316 Helms Street, Richmond on June 29, 1961, four days after the accident. Ulp asked Bowens where he lived and the latter gave him the Helms address. On the same day Ulp saw Madden who told him that Bowens had formerly lived with him but was then living with Cornelius Jones. During the interview with Bowens, the latter

---

[7]The accident occurred at 10 p.m. on June 25, 1961 (a Sunday).

[8]Bowens was cited for a violation of Vehicle Code section 22450 (failing to stop at stop sign).

had told Ulp that he was the registered owner of a 1955 Buick. When Ulp called on Madden, who said he was using the Buick,[9] he saw the car parked in front of Madden's apartment and observed that the registration certificate showed Frederick W. Bowens, 3516 Helms Street, Richmond. On August 4, 1961, six weeks after the accident, Bowens appeared in Berkeley municipal court in response to a citation arising out of the accident. At that time he again gave the same address.

As we have said, it was within the province of the trial court who heard and saw the witnesses to reject the testimony of the Joneses and Bowens that the latter was not living in the Richmond house at the time of the accident. At the same time the court was justified in concluding from the above evidence that on the day of the accident, and for a substantial period of time before and after it, Bowens was living together with his aunt and uncle in the same house. Under the cases to which we have referred it was not necessary in order to be a resident of the same household for Bowens to have been living there as a permanent family member, much less, as plaintiff would have it, for him to be a member of the family living there permanently as one unit headed by Mr. Jones for the promotion of their interest and happiness. Webster's Third New International Dictionary gives the following definitions: "Resident . . . one who resides in a place: one who dwells in a place for a period of some duration—often distinguished from inhabitant"; "reside . . . to dwell permanently or continuously: have a settled abode for a time: have one's residence or domicile"; "residence . . . (1): the place where one actually lives or has his home as distinguished from his technical domicile (2): a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit (3): a domiciliary place of abode." ▮ We think that a resident of the same household is one, other than a temporary or transient visitor, who lives together with others in the same house for a period of some duration, although he may not intend to remain there permanently. ▮ In the light of the applicable principles of construction stated above and the

---

[9]Madden testified that he was using the Buick at the time and later bought it from Bowens. "When I taken the car, it was understood that I was going to take over the payments. The car was going back and I had taken over the payments."

evidence summarized by us, we are of the opinion that the trial court properly determined that under the terms of the policy Bowens was a relative of the named insured who was a resident of the same household.

We now take up the question whether under the evidence Bowens was driving the Chevrolet with the permission of Madden. It is manifest that the word "permission" in the clause of the policy in question, appearing without definition, must be deemed to include express or implied permission. (See *Jurd* v. *Pacific Indemnity Co.* (1962) 57 Cal.2d 699, 704 [21 Cal.Rptr. 793, 371 P.2d 569] ; *Exchange Cas. & Surety Co.* v. *Scott, supra,* 56 Cal.2d 613, 622; *Norris* v. *Pacific Indemnity Co.* (1952) 39 Cal.2d 420, 423 [247 P.2d 1].) Whether or not such permission was present at the time and place of the accident is a question of fact. (*Jurd* v. *Pacific Indemnity Co., supra*; *Exchange Cas. & Surety Co.* v. *Scott, supra*; *Financial Indem. Co.* v. *Hertz Corp.* (1964) 226 Cal.App.2d 689, 695 [38 Cal.Rptr. 249] ; see *Hobbs* v. *Transport Motor Co.* (1943) 22 Cal.2d 773, 778 [141 P.2d 738].) "Where the trier of fact has drawn an inference of such implied permission from conflicting evidence bearing on that issue, which inference appears to be reasonable and supported by substantial evidence, that factual conclusion of permissive use may not be disturbed on appeal. [Citations.] Furthermore, the evidence must be viewed most favorably to respondent, *and all reasonable inferences should be indulged in to uphold the judgment."* (Italics added.) (*Peterson* v. *Grieger, Inc.* (1961) 57 Cal.2d 43, 51-52 [17 Cal.Rptr. 828, 367 P.2d 420].)

 We are satisfied that the trial court's finding that Bowens was driving with Madden's permission is supported by substantial evidence. Bowens had driven the car on previous occasions with Madden's knowledge and sometimes when the latter was in the car himself. After the Chevrolet stopped running and was placed on blocks, Bowens began "tinkering" with it in order to get the car back in working condition. This was known to Madden, who not only did not object to Bowens' attempt to repair the automobile, but gave him permission to so tinker if he could "get it running." Of necessity it would appear that if the permission given was to "get it running," permission to *drive* the car, if not express, can at least be implied. Additionally Madden knew that Bowens had access to the key to get it started, perhaps the *only* key. Furthermore, Madden never objected to Bowens' driving the Chevrolet.

In assessing this issue of permissive use, we do not lose sight of the fact that Bowens and Madden were cousins. ██ As this court said in *Elkinton* v. *California State Auto. Assn.* (1959) 173 Cal.App.2d 338, 344 [343 P.2d 396], "Where the issue of implied permissive use is involved, the general relationship existing between the owner and the operator, is of paramount importance. Where, for example, the parties are related by blood [citations], or marriage [citation], . . . weaker direct evidence will support a finding of such use than where the parties are only acquaintances [citation], or strangers [citations]."

We conclude that the trial court properly determined that Bowens was an additional insured under the automobile policy in question.

The judgment is affirmed.

Molinari, J., and Sims, J., concurred.