[Civ. No. 15098. Fourth Dist., Div. Two. Oct. 21, 1975.]

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, Plaintiff, Cross-defendant and Appellant, v.
SHARON ELKINS, Defendant, Cross-complainant and Respondent;
JAYNE BURT et al., Defendants and Respondents.

**COUNSEL**

Spray, Gould & Bowers and Daniel O. Howard for Plaintiff, Cross-defendant and Appellant.

Tyre & Kamins and Peter M. Appleton for Defendant, Cross-complainant and Respondent.

Lyle S. Burt and Jayne Burt, in pro. per., for Defendants and Respondents.

**OPINION**

**TAMURA, J.**—This is a declaratory relief action to determine whether two automobile liability insurance policies issued by State Farm Mutual Automobile Insurance Co. (State Farm) covered the daughter of the named insured in connection with an automobile accident in which she was involved and which resulted in personal injury to one Sharon Elkins. State Farm appeals from an adverse judgment following a court trial.

The policies in question were issued to Lyle Burt as named insured. However, State Farm was notified that his daughter Jayne Burt was a driver who should be covered by the policies and premiums were computed on that basis. The car driven by Jayne at the time of the accident did not belong to her father but was one which she had borrowed for a short period from one of her friends. Regarding nonowned automobiles, the policies insured Lyle Burt and all relatives

who were residents of his household. The principal issue litigated below was whether at the time of the accident Jayne was a "resident of the household" of her father within the meaning of the policy.

The evidence introduced at trial consisted almost entirely of the deposition of Jayne Burt in which she described her living arrangements at the time of the accident. The accident occurred on July 31, 1971. According to her deposition, she was then 19 years old, an unmarried, unemancipated minor. Prior to February 1971, she had been a student at Fullerton Junior College. She decided not to continue at that school but instead applied for admission to California State College at Fullerton for the fall semester, 1971. In May 1971, she obtained a full-time position with Pacific Telephone Company in Anaheim which she hoped to continue on a part-time basis while attending the state college. About the end of May she began renting a furnished apartment some four miles from her parents' home.[1] When asked why she did so, she replied, in essence, that the move was an experiment designed to test her ability to be independent.[2] She continued to maintain a room in the family house where she kept some of her belongings and to which she returned when her parents were away from the house and she was needed to take care of the younger children.[3] During the 6 to 8 weeks preceding the accident she estimated that she took 34 to 39 meals at her parents' home. Her parents allowed her to use the family cars when one was available. While at the apartment she paid for her rent, food and utilities but her

---

[1]This apartment had been rented by another girl who stayed there with Jayne Burt for a week or two and then joined her family in Memphis, Tennessee, for the summer. During the summer the other girl paid a small percentage of the rent although the two girls had planned to share the apartment and all its expenses equally beginning in September.

[2]Regarding the reasons for the move, Jayne Burt testified: "I moved because I had found the job with the telephone company and knew that I would be making enough money to try my hand at paying my own living expenses for awhile—and being away. I was planning to go to Cal State Fullerton in the fall and thought that I would be close enough then to go to school, and living close to home and close to school and trying at being a little bit independent for awhile, at least for the summer. . . . My parents were at first very opposed to the idea, but then they thought that I should try for awhile and keep the things like my driver's license and Social Security with Canyon Drive [the parents' home] because my father was still legally responsible and helping me go to school. So the understanding was that I could do some and try it out for awhile but that we would still keep home as home."

[3]Regarding the time she spent at her parents' house after the move, Jayne Burt testified: "Oh, I had Sunday dinner with them often. I went to church with them. My parents went out of town once for a week to Houston and once to Utah. I stayed with the younger children during the week that they were gone, and I baby-sat several evenings and stayed—I'd leave when my parents were there, I stayed a couple of nights. Usually it was when they were gone that I stayed with the kids, but I was there for meals and errands. When I needed a car I used theirs because I didn't have one."

parents had promised to pay half of her school expenses when she resumed her studies. Most of the dishes and cooking ware for the apartment were borrowed from her parents and subsequently returned.

In July 1971, prior to the accident, Lyle Burt learned he was to be transferred shortly to Houston, Texas. Jayne and her parents decided that she would move also, which she subsequently did, because she did not want to be separated from her parents by such a great distance. It was decided that Jayne would stay in Fullerton through October in order to complete six months on her job before resigning. Before the accident many of Jayne's belongings were shipped to Houston along with those of her parents. Her parents left about a week after the accident. Jayne joined them in Houston around November 1, 1971.

The trial judge found that "On July 31, 1971, Jayne Burt's permanent residence was the home of her parents," and concluded that "On July 31, 1971 Jayne Burt was a resident of the household of Lyle S. Burt." The only issue on appeal is whether the evidence supports the court's finding. For the reasons to be stated, we conclude that it does.

Preliminarily, we note that there is a strong presumption in favor of the correctness of the judgment below. This is so not only because the well-established rules of judicial review require us to view the evidence in the light most favorable to the respondent, but also because, in doubtful cases, the law favors the insured over the insurer. Any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer; if semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates; if the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against, the amount of liability or the person or persons protected, the language will be understood in its most inclusive sense, for the benefit of the insured. (*Holz Rubber Co., Inc.* v. *American Star Ins. Co.,* 14 Cal.3d 45, 59-60 [120 Cal.Rptr. 415, 533 P.2d 1055]; *Crane* v. *State Farm Fire & Cas. Co.,* 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; *Continental Cas. Co.* v. *Phoenix Constr. Co.,* 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914]; *Hardware Mutual Casualty Co.* v. *Home Indemnity Co.,* 241 Cal.App.2d 303, 306-307 [50 Cal.Rptr. 508], and cases cited therein.)

Next we note, as State Farm points out, that on the precise issue before us, persons to be afforded liability coverage regarding a non-

owned automobile, the terms of the policy control. There is no statute specifying the extent of coverage which must be afforded as regards nonowned automobiles. The insured and insurer could tailor the extent of the coverage according to their own desires.

The policies in question provided coverage to the named insured and "if residents of the same household, his spouse or the relatives of either . . . " The policies also contain the following definition: "*Resident or Reside*—when used with reference to the named insured's household, means bodily presence in such household and an intention to continue to dwell therein. However, the named insured's unmarried and unemancipated children, while away from his household attending school, are deemed to be residents of his household."

This definition is not free of ambiguity. Obviously, "bodily presence" does not mean bodily presence at the very moment of the accident since this would provide an absurdly narrow and virtually worthless coverage. Nor can bodily presence be taken to exclude absence from the home for a weekend holiday since this also would provide an absurdly limited construction which would not meet the reasonable expectations of the insured. Exactly what degree and form of bodily presence is intended cannot be conclusively determined from the terms of the policy alone. Similarly, the phrase "an intention to continue to dwell therein" contains a certain inherent vagueness. Although an intention to remain for a single day would probably be insufficient, an intention to remain for life would certainly not be required. In our society, children generally expect to leave their parents' household at some point after adulthood but this would obviously not preclude coverage.

At the time of the accident Jayne Burt was bodily present in her father's household in many ways. She frequently took meals there. She maintained a bedroom in the family house containing many of her belongings and occasionally spent the night there. She testified that while living at the apartment she saw or spoke with at least one of her parents every day. She was still regarded as an intimate family member, running errands for her parents and borrowing the family cars. In fact she was returning to her apartment after spending part of the day at the family home when the accident occurred.

Likewise, she had an "intention to continue to dwell therein" as shown by her decision to follow her parents to Houston. Her stay in the apartment was a temporary experiment, not a permanent separation.

In view of the rules for construing insurance policies to which we have alluded, the foregoing considerations amply support the trial court's decision. The decision is consistent with other cases interpreting similar phrases in insurance policies. Those cases, while not involving identical facts, are relevant to determine the commonly accepted meaning of "resident" in the insurance field.

In *Olson v. Standard Marine Ins. Co.,* 109 Cal.App.2d 130 [240 P.2d 379], an unmarried daughter who had been living with her mother in a San Francisco hotel owned by the mother moved to an apartment in Los Angeles which was burglarized. The mother had a policy insuring against loss "the property of the Assured and members of his or her family of the same domicile." The court upheld a judgment against the insurer for the value of the items lost in the burglary. In answer to the contention that the daughter was not of the same domicile as the mother, the court said: "Respondent Paul [the daughter] testified that by coming to Los Angeles she had not intended to change that domicile or to make the apartment in Los Angeles her home unless the hotel was sold and she married her fiance George Miller. The hotel was not sold until long after the articles were stolen and respondent Paul never married Mr. Miller. Such evidence is substantial, adequately supports the implied finding of common domicile, and therefore must be accepted as true." (*Olson v. Standard Marine Ins. Co., supra,* 109 Cal.App.2d 130, 136-137.)

In *Cal-Farm Ins. Co. v. Boisseranc,* 151 Cal.App.2d 775 [312 P.2d 401], a six-year-old child injured another child. The father of the first child held a comprehensive liability policy which protected him and his wife and relatives "if residents of his household." When the injury occurred, the father was divorced from the child's mother and custody had been awarded to the mother. However, the evidence showed that up to and following the accident the child spent more time with the father than with the mother. Although the accident occurred while the child was with the mother, the court upheld a finding that the policy applied. After reviewing the authorities, the court stated: "In the instant case, we start with the premise that the terms of the interlocutory [custody decree], while a factor, are not conclusive. We know that after the decree the child spent three-fourths of his time with his father under circumstances where the child was certainly a 'resident' of his father's 'household,' at least while actually living with his father. The accident happened a few days after the child had left the father's home to live a short while with his mother. Under the cases discussed above we know that actual residence at the time of the accident is not conclusive and that coverage

may exist while temporarily away from the named insured's premises. Certainly, under the facts, the child had a continuing relationship with his father, so far as residence is concerned. In view of the purpose of such policies already discussed, and the rules of construction applicable to such policies, it must be held that the finding of the trial court on the issue is supported." (*Cal-Farm Ins. Co.* v. *Boisseranc, supra,* 151 Cal.App.2d 775, 783-784.)

In the case at bench we conclude that the trial judge's finding that Jayne Burt was a resident of her father's household at the time of the accident is well within the bounds of reason and is supported by the evidence.

Judgment is affirmed.

Gardner, P. J., and Kerrigan, J., concurred.