375 So.2d 328 (1979)
UNITED STATES FIDELITY AND GUARANTY COMPANY, Appellant,
v.
Lila WILLIAMS, As Personal Representative of the Estate of Barbara Jean Young, Appellee.
No. LL-426.
District Court of Appeal of Florida, First District.
July 18, 1979.
Rehearing Denied October 12, 1979.
*329 Milton H. Baxley, II, Gainesville, for appellant.
Robert P. Cates, of Goldin & Cates, Gainesville, for appellee.
ROBERT P. SMITH, Jr., Judge.
Appellant appeals from that part of a final declaratory judgment holding that appellee's decedent was a "named insured" under an automobile insurance policy issued by appellant to the decedent's mother; appellee cross-appeals the court's finding that decedent and her mother, the named insured, were not members of same household at the time of decedent's death. We reverse on both points.
Although appellee's decedent was noted on the policy as the sole operator of the insured vehicle, this did not make her a "named insured" for purposes of uninsured motorist coverage under the terms of the policy or under Section 627.727, Florida Statutes (1977). See generally Kohly v. Royal Indemnity Co., 190 So.2d 819 (Fla. 3d DCA 1966); cert. denied, 200 So.2d 813 (Fla. 1967); Mattingly v. Liberty Mutual Ins. Co., 363 So.2d 147 (Fla. 4th DCA 1978).
On the second point, however, the manifest weight of the evidence in the record shows that the "named insured," Beatrice Griffin, was a member of the same household as appellee's decedent Barbara Young at the time of Young's death, entitling appellee to uninsured motorist coverage under the policy's amendatory endorsement. See also Hunt v. State Farm Mutual Ins. Co., 349 So.2d 642 (Fla. 1st DCA 1977).
Therefore we reverse paragraphs one and two of the declaratory judgment but affirm the court's finding that appellee is entitled to uninsured motorist coverage under Griffin's policy.
AFFIRMED in part and REVERSED in part.
MILLS, C.J., and HENRY CLAY MITCHELL, Jr., Associate Judge, concur.

ON PETITION FOR REHEARING
PER CURIAM.
The petition for rehearing is DENIED.
MILLS, C.J., and MITCHELL, HENRY CLAY, Jr., Associate Judge, concur.
ROBERT SMITH, Jr., J., dissents.
ROBERT P. SMITH, Jr., Judge, dissenting:
*330 We have carefully reexamined the record in light of USF&G's contention on rehearing that the trial court's judgment, after a nonjury trial, rested on a finding of fact made on conflicting evidence, and that we must accede to the finding that Barbara Young and Beatrice Griffin, her mother, "were not residents of the same household at the time of the death" of Barbara Young in an auto accident on March 20, 1977. Since we have decided that Barbara Young was not a named insured under the automobile policy issued August 1, 1975, USF&G concludes that she was not an insured at all.
This is a claim by the personal representative of Barbara Young, deceased, for uninsured motorist benefits under a USF&G policy issued to Beatrice Griffin as the named insured on August 1, 1975, and renewed a year later. The policy was intended to provide uninsured motorist benefits to Beatrice Griffin and her household members, including daughter Barbara Young, whom the application listed as the only driver because, as the application stated, Beatrice Griffin "is not licensed and does not drive." Beatrice Griffin had credit, but no driving ability; daughter Barbara Young had no credit but was licensed; both needed transportation. Hence a car purchase and this insuring transaction.
In the dubious testimony of Turner Sanders[1] I think there is evidence that for a period of one year, or two years, or three years ending shortly before Barbara Young's fatal accident in March 1977, Beatrice Griffin lived with Turner Sanders in her rented house on Southwest Sixth Place in Gainesville. At the time Barbara was killed, Sanders testified, Beatrice lived at the same place, or at least spent "some nights" there, with her son Leon, his "old lady," and their "baby boy." During that period, Barbara Young lived in a rented place on Northeast 25th Terrace with her children and sister Ethel's, six in all.
If the determinative issue in this case were whether Beatrice Griffin slept under the same roof with daughter Barbara at the time of Barbara's death, I think we should be obliged by Sander's testimony to sustain USF&G's position in deference to the trial court's fact finding that mother and daughter were not "residents of the same household" when Barbara died on March 20, 1977. But that is not the issue; and it appears that, whatever may be the effect of the trial court's finding of Beatrice Griffin's household residence "at the time of the death" of Barbara Young, the trial court may have been led into too restrictive a definition of the "household" concept written into the policy.
In determining whether Barbara Young was an additional insured under USF&G's policy, and entitled to uninsured motorist benefits, we and the trial court must give appropriate effect, if possible consistently with the facts, to the policy's obvious purpose to insure both Beatrice Griffin and Barbara Young (the trial court thought that purpose sufficiently obvious to support a finding that Barbara Young was a "named insured"); we must carefully regard the nature of Beatrice Griffin's "household" during the 18-month period the policy was outstanding before a claim event occurred; and we must employ canons of construction which construe "residing in the same household" as liberally as those words may reasonably permit in common usage, so to give effect to the intentions of the parties and the purpose of the insurance.[2] By *331 these standards, though we must disregard Beatrice Griffin's testimony that she lived in Barbara Young's house on Northeast 25th Terrace at the time of Barbara's death in March 1977, there is other evidence which, if believed by the trier of facts, supports the conclusion that this mother and daughter were residents of the same household, though not always of the same house, throughout the policy period, and that the household nexus, existing in fact and in the contemplation of the contracting parties, was not broken at the time of Barbara's death.
In identifying additional insureds, USF&G's policy might have defined "residing in the same household" as living continuously in the same house; but it did not. The policy might have defined "household" as a single place of residence exclusive of all others; but it did not. The concept of household as a family unit, rather than as an address, is incorporated in the Automobile Reparations Reform Act, which is useful here only by analogy: Section 627.732(4), Florida Statutes (1977), provides that one resides in the family household if he "usually makes his home in the same family unit, whether or not temporarily living elsewhere." Absent restrictive definitions in either the USF&G policy or the uninsured motorist protection statutes, we are at liberty to define "household" with due regard to the cultural characteristics given that term by she, who bought the policy to protect the "household."
In these days of nuclear families, households extend beyond houses to include children, experimenting with independence, who live mostly apart from their parents; estranged spouses living apart in lives of transition; family members who recently lived continuously within the unit, and who still come and go freely, as persons accorded household identity and subjected to household claims. Miller v. United States Fidelity & Guaranty Co., 127 N.J. Super. 37, 316 A.2d 51 (1974)[3]; Travelers Ins. Co. v. Mixon, 118 Ga. App. 31, 162 S.E.2d 830 (1968)[4]; Hobbs v. Fireman's Fund American Ins. Co., 339 So.2d 28 (La. App. 1976), appl. denied 341 So.2d 896 (La. 1977)[5]; State Farm Mut. Automobile Ins. Co. v. Elkins, 52 Cal. App.3d *332 534, 125 Cal. Rptr. 139 (1975)[6]; State Farm Mutual Automobile Ins. Co. v. Holloway, 423 F.2d 1281 (10th Cir.1970). See also American Cas. Co. v. Harleysville Ins., 238 Md. 322, 208 A.2d 597 (1965). That being true even in cases of conventionally middleclass white families, it is more demonstrably true in the case of a prolific and relatively poor black family like this one, several of whose numerous members were almost continuously transient within Gainesville, depending on who had money, who could look after the children, who could drive a car and had one to drive, and who had heat in the house.
These are the facts as I understand the record:
Beatrice Griffin, who had nine children and numerous grandchildren, works at Graham Hall at the University of Florida in Gainesville. Her testimony is partly corroborated by other family members and neighbors. She stated that she lived during most of 1975 in her rented house on Southwest Sixth Place, and her family living in that house included Barbara Young, who worked at Sunland Training Center, Barbara's four children, daughter Ethel's two children in Barbara's care, and son Leon and his companion, Georgia Barnes. During the summer of 1975, using credit available to her from the campus credit union, Beatrice Griffin bought a 1971 Ford "so I would have transportation to get back and forth to work and to church." Her application for USF&G insurance on the car, taken by agent Herbert Treweek, listed Bobbie F. Young (Barbara Young) as the only driver and correctly stated: "Beatrice Griffin is not licensed and does not drive. Bobbie F. Young is her daughter." The policy was issued effective August 1, 1975.
In the latter part of 1975, according to Beatrice Griffin's testimony, Barbara Young and the children moved "out to Carver Gardens." Within a month, Beatrice followed, taking her clothes and her studio couch (Beatrice's bed was at daughter Dot's house). As before, Beatrice testified, Barbara "took me back and forth to work and then I be home with the children."
In 1976, apparently during the fall, Beatrice Griffin left the house at Carver Gardens, according to her testimony, and moved in with daughter Betty Jean "back on Eighth Avenue" in the Spring Hill section of Gainesville. But "it had turned so cold" at Betty Jean's by Christmas 1976, that after only "two or three months" there, the whole crowd  Beatrice Griffin, Betty Jean, Barbara, and the six children  moved into a Northeast 25th Terrace house which Barbara rented from the housing authority. They were joined there for a time, according to Beatrice's testimony, by Ben, Jr., another of Beatrice's children, and by Franklin, still another. During the remaining three months before Barbara's death, Beatrice testified, she lived principally in the Northeast 25th Terrace house, among a household including Barbara Young. She said she spent weekends back in her house on Southwest Sixth Place in order to look after that house, which remained occupied by son Leon and Georgia Barnes. Asked why she lived with daughter Barbara, Beatrice testified:
Because she had the most children and she could drive and take me back and forth to work. And she had the most children and I wanted to help her, you know.
Beatrice Griffin's testimony concerning her living arrangements with Barbara Young is partly corroborated by Beatrice's daughter, Lila Williams. Yet it is contradicted by the legally competent testimony of Turner Sanders, who by deposition testified that Beatrice lived with him in the *333 Southwest Sixth Place house for "about a year," or "about two years," or for "something like three or four years or something" (later retracting "four years") ending shortly before Barbara's death in March 1977. At that time, Sanders testified, he lived apart in "my own room," and Beatrice remained in the Southwest Sixth Place house with "her son [Leon] and his old lady," evidently Georgia Barnes. Turner Sanders' testimony is corroborated in part by a neighboring resident of Southwest Sixth Place, who said Beatrice Griffin lived across the street until Barbara Young was killed; but that witness also said Beatrice "would go out there and stay some with her," meaning Barbara, and that "when I would miss her she would say that's where she was at all the time."
I think USF&G correctly urges that my opinion for the Court filed July 18, 1979, too hastily concluded that the manifest weight of the evidence shows Beatrice Griffin resided in the same household as Barbara Young "at the time of Young's death." We are bound to acknowledge that, on Turner Sanders' testimony, the trial court could have found that Beatrice Griffin lived apart from Barbara Young at the moment of Barbara's death, or for one, two or three years previously.
I think, therefore, that we erred by holding, as a matter of law, that Beatrice Griffin "resided in the same household" with Barbara Young at all pertinent times. We cannot conscientiously say that the period of her living principally with Turner Sanders, be it three months, one year, two years, or three (or more), is insignificant in determining the coverage issue. We can and should hold, however, that it was not impossible for Beatrice Griffin to have had two residences and two households, one of them with Barbara Young as contemplated by the USF&G policy. If Beatrice Griffin's testimony was believable in major part by the trial judge, and she did in fact shoulder significant household responsibilities within a family unit including Barbara, and she lived exclusively with Sanders for a period nearer the shorter than the longer range of his testimony, or if her living with Sanders was not exclusive of regular living also, by day or night, with Barbara, then there is substantial evidence on which the trial judge might conclude, consistently with the authorities discussed above, that Beatrice Griffin resided in the same household with Barbara.
Accordingly, I would recede from our ruling previously announced; but, because the trial court did not announce the extent to which the court discredited Beatrice's testimony and accepted Turner Sanders', and had no opportunity to consider the facts in light of the authorities above discussed, I would reverse the judgment in favor of USF&G and remand the case for further proceedings.
NOTES
[1] We must disregard as hearsay, incompetent as affirmative evidence on the merits, the impeaching evidence of Sanders' extrajudicial statement to an insurance adjuster. Were that statement to be given effect as independent evidence, it would tend to show that Sanders and Beatrice Griffin lived independently of Barbara Young for four years, hence that policy never covered the only listed driver, Barbara Young.
[2] E.g., Inter-Ocean Cas. Co. v. Hunt, 138 Fla. 167, 189 So. 240 (1939). When used in a policy exclusion clause, instead of an insuring clause, the term "residing in the same household" may require a different, more restrictive construction. See Annot., 46 A.L.R.3d 1024 n. 2 (1972).
[3] Miller, 316 A.2d at 55-56:

Here, the undisputed evidence established that Daryl was in fact a resident of two households. He resided with his natural mother during the week from Monday to Friday, and with his natural father on weekends from Saturday to Sunday. A substantially integrated family relationship existed between Daryl and his mother on the one hand, and Daryl and his father on the other during the time that he lived with each one. Daryl's intention to be a part of each household is clearly manifested by his response to the question `Who do you live with?'  `My dad and my mom.'
[4] Mixon, 162 S.E.2d at 831:

It is generally recognized that a person may, and many people do, have more than one residence, and the composer of this policy provision could have defined `resident' as `resident exclusively' or `resident for a greater part of the time.' The authorities we have found on the question do not indicate that residing at another place a part of the time negates a relative being a resident of the household of an insured under an extension of coverage provision.
[5] Hobbs, 339 So.2d at 36:

There is no manifest error in the trial court's conclusion that Mrs. Phillips maintained a residence at her previous Mississippi domicile. The Mississippi farm was jointly owned by Mrs. Phillips and her husband; she was free to come and go to that home at her pleasure; a great many of her valuable personal belongings remained at the Mississippi household; and she intended to return to that area to do her Christmas shopping.
.....
... Relevant here are the facts that Mrs. Phillips was, admittedly, a resident of the household when the policies were purchased; her Chevroiet station wagon was specifically listed as covered under the policies; Reserve treated Mrs. Phillips as the named insured in their policy when they accepted her signature (and only hers) as named insured to waive all coverage in the event the Phillips' retarded son was engaged in activity inducing liability under the policy. Therefore the coverage purchased was specifically intended by the parties to the instrument to apply to Mrs. Phillips' activities. (Emphasis by the Court.)
[6] Elkins, 125 Cal. Rptr. at 142:

She frequently took meals there. She maintained a bedroom in the family house containing many of her belongings and occasionally spent the night there. She testified that while living at the apartment she saw or spoke with at least one of her parents every day. She was still regarded as an intimate family member, running errands for her parents and borrowing the family cars. In fact she was returning to her apartment after spending part of the day at the family home when the accident occurred.