ALLSTATE INSURANCE COMPANY, Plaintiff–Appellee,

v.

Allen R. BARNES, Brett Thomas Baer, Angela Marie Cotter, Angela K. Pierce, a minor, and Brie Candace Baer, a minor, Defendants–Appellants.

Court of Appeals of Tennessee, Eastern Section.

Jan. 12, 1995.

Permission to Appeal Denied by Supreme Court March 20, 1995.

Julia S. Howard and W. Tyler Chastain, Hodges, Doughty & Carson, Knoxville, for appellants Brett Thomas Baer, Angela Marie Cotter, Angela K. Pierce, and Brie Candace Baer.

Joseph B. Yancey and William L. Cooper, III, Knoxville, for appellant Allen R. Barnes.

Paul E. Dunn and John E. McDonald, Jenkins & Jenkins, Knoxville, for appellee.

## OPINION

SUSANO, Judge.

This is a declaratory judgment action brought by Allstate Insurance Company (Allstate) against Allen R. Barnes (Allen) and four individuals allegedly injured and damaged as a result of Allen's negligent driving of a Chevrolet van titled to the wife of his uncle, Willard Key Barnes (Willard)[1]. The latter is the named insured in the Allstate automobile liability insurance policy whose construction is at issue in this case. The trial court, after a bench trial, found that Allen was not an insured, and hence not covered, under the Allstate policy because he was not a "resident of the named insured's household" as that language is used and defined in the policy. The sole issue in this case is whether the trial court erred in determining that Allen was not a "resident of [his uncle's] household."

## I

This appeal, being from a non-jury trial, is governed by Tenn.R.App.P. 13(d). Our review is de novo upon the record of the trial court. That record comes to us accompanied by a presumption that the trial court's findings are correct, unless the evidence preponderates against those findings. No presumption attaches to the trial court's conclusions of law. *Rainey v. Stansell*, 836 S.W.2d 117, 118 (Tenn.App.1992).

## II

The following language of the Allstate policy is relevant to the issue before us:

1. For ease of reference, Allen R. Barnes and Willard Key Barnes will sometimes be referred to by their first names.

## SECTION 1

### LIABILITY PROTECTION

Automobile Liability Insurance

**COVERAGE AA—Bodily Injury**

**COVERAGE BB—Property Damage**

Allstate will pay for an insured all damages which the insured shall be legally obligated to pay because of:

1. bodily injury sustained by any person, and

2. injury to or destruction of property,

arising out of the ownership, maintenance or use ... of the owned automobile ...

\*    \*    \*    \*    \*    \*

The following persons are insured under this Section:

\*    \*    \*    \*    \*    \*

2. Any resident of the named insured's household with respect to the owned automobile;

\*    \*    \*    \*    \*    \*

Definitions of words used under this Section:

\*    \*    \*    \*    \*    \*

3. Miscellaneous

\*    \*    \*    \*    \*    \*

(e) *"resident"* or *"reside"* means, when used with reference to the named insured's household, bodily presence in such household and an intention to continue to dwell therein ...

The thrust of these provisions, as pertinent here [2], is that Allstate's coverage under this policy extends to a "resident of the named insured's household." One is such a "resident" if one has a "bodily presence in such household and an intention to continue to dwell therein ..." If Allen is a "resident" as defined in the policy, he is covered by the Allstate policy. If he is not, there is no coverage.

### III

Willard and his wife, Iva Barnes, resided at 2539 Booger Town Road in Sevier County. Willard had not seen his nephew, Allen, for 12 to 14 years when, in the summer of 1990, he was reintroduced to him at the residence of Willard's mother. Thereafter, the two men went horseback riding on several occasions. In August, 1990, Allen came to his uncle's home, and told him that he had broken into a house and stolen some property. He asked his uncle to drive him to jail so he could turn himself in. Willard subsequently helped bail his nephew out of jail.

When he got out of jail, Allen asked his uncle "if he could spend some time" at his home. According to Willard, "[Allen] said that he wanted to clean his life up and he didn't believe he could stay straight staying with his dad because his dad drank a lot." Willard testified that "I told him that I would let him stay some, that, you know, I didn't want to, but I'd give him a chance and help him out, to see if he could straighten himself out, give him a little bit of time to go ahead and get some money and find him an apartment and move out." Willard and his wife permitted Allen to move in sometime during August [3], but refused to let him use one of their bedrooms. Instead, they told him he could sleep on a couch in their basement den. At trial, Mrs. Barnes gave the following testimony:

Q: The downstairs, there were two bedrooms and then this den.

A: Yes.

Q: Now, why was it that he didn't stay in one of the bedrooms down there?

A: Because that wasn't an option. We didn't give him that choice.

Q: You didn't want him to get too comfortable down there?

---

**2.** Other provisions of the policy come into play if the use of the "owned automobile" is "with the permission of the named insured"; but these provisions are not applicable here because the evidence does not preponderate against the trial court's finding that Allen was driving the van without the owner's permission. In any event, that finding is not questioned on this appeal.

**3.** Willard was not sure of the exact date in August that Allen came to live at his residence. He testified "[t]he best I remember, sometime in August, the latter part of August somewhere, or sometime in August. I don't remember, but that's the best I remember."

A: No, we didn't.

Willard and his wife both testified that they never gave Allen either a house key or keys to any of their vehicles. Willard stated that on one occasion he specifically instructed Allen that "[y]ou know that you cannot drive any of these vehicles because you don't have a driver's license ... [T]hat, you know, includes on the job, or whatever." Allen's license had been revoked before he moved into his uncle's home. Finally, there was testimony that Allen paid no rent, bought some of his own food, did his own laundry, cleaned up after himself downstairs, and spent most but not all of the nights at his uncle's home during his brief stay there. The record reflects that he stayed some nights with his father, and a night or two with Willard's sister.

Willard made plans to go horseback riding with Allen and a group of friends on September 15, 1990. On the evening of September 14, according to Willard, Allen asked him if he could go to the family barn to ride a particular horse in preparation for the outing the next day. As the family barn was approximately one mile from Willard's house, Willard drove Allen there and told him to call when he was finished riding and that he, Willard, would pick him up and take him back to the house. Allen did not call. Willard testified that he went to look for Allen and the horse early the next morning, but ceased to worry when he found the horse and saddle in good order in the barn, because "I knew he [Allen] was fine." Willard then went on the planned ride.

After Willard left, Mrs. Barnes learned from her brother-in-law that morning that her Chevrolet van was missing. She checked to see if her husband had taken the van; on finding that he had not she reported the van stolen. She told the sheriff's office she suspected that Allen had taken the vehicle.

According to statements made by Allen to the police and to an Allstate adjustor, he took the van from a shed located about 150 feet from the Barnes' home and drove it toward Maryville in order to meet a female acquaintance. He admitted drinking some beer before leaving as well as some on the way. A Maryville Police Department traffic accident report, which was entered into evidence by stipulation of the parties, indicated that Allen was involved in a head-on collision at 11:13 P.M. that evening when he drove the van into the oncoming lane of traffic on Highway 411 in Blount County. Willard and his wife did not learn of the accident until four days later, when an Allstate claims representative contacted them.

The trial judge, speaking from the bench, stated that the "overwhelming proof" in the case indicated that Allen's operation of the van was without the owner's consent, and that "[t]he proof is undisputed in this record that Mr. Allen Barnes had no intent to continue to dwell at the place where he hung his hat." He further stated that "[i]t's ludicrous to me to believe that the Court is bound to decide the issue of intention based solely on a person who's not a party to this contract." The trial court's Final Judgment concluded that Allstate had "no responsibility or liability" to defend Allen or to pay any judgment which might be rendered against him.

## IV

We begin our analysis by noting that "the paramount rule of construction in insurance law is to ascertain the intent of the parties." *Blue Diamond Coal v. Holland–America Ins. Co.*, 671 S.W.2d 829, 833 (Tenn.1984). It is the obligation of the courts "to enforce contracts according to their plain terms." *Bob Pearsall Motors, Inc. v. Regal Chrysler–Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn.1975). Like other contracts, insurance policies are to be interpreted by giving words "their common and ordinary meaning." *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn.1993). If language in a policy is found to be ambiguous, i.e., "susceptible of more than one reasonable interpretation," it will be "construed against the insurance company and in favor of the" person seeking coverage. *Id.*

There are three policy requirements that Allen must satisfy if he is to be an "insured" under and covered by the Allstate policy. These are:

1. A "bodily presence";

2. "in [his uncle's] household"; and,

3. an "intention to continue to dwell therein."

If he falls within this language of the policy, he is an "insured" under the policy and it is immaterial that he was driving the van, a covered owned automobile, without the owner's permission. He will satisfy these requirements if he is covered by the "common and ordinary meaning" of the language in the Allstate policy. He can also claim coverage if the words in the policy are "susceptible of more than one reasonable interpretation" and he is encompassed within one of those reasonable interpretations. *Id.* at 650.

■ Allen had a "bodily presence" in his uncle's home for a brief period of time prior to the accident. That "bodily presence" started sometime in August, 1990, and ended the following month when Allen was involved in the accident on September 14, 1990. Except for three or four nights with his father or aunt, he slept on the sofa in his uncle's downstairs den. His uncle admitted as much under cross-examination when he stated that "I mean there's no question he stayed there, yes." It seems clear to us that when "bodily presence" is given its common and ordinary meaning, Allen meets the first of the policy's three-prong test of what constitutes a resident.

■ Coverage becomes less clear when we examine Allen's relationship to his uncle's residence with reference to the requirement that he be "in [his uncle's] household." [4] As we have recently pointed out, a "household," as that term is used in an insurance policy, connotes more than a place. *Gredig v. Tennessee Farmers Mut. Ins. Co.,* 1994 WL 446889 (Tenn.App.), (" 'household' contemplates a relationship and a place and not just a place"). It is not enough to conclude that Allen was in his uncle's house. As we have stated, he did have a "bodily presence" there; but the policy does not refer to the insured's house. It refers to his "household." As we will see, there is a difference between a house and a "household" as the latter term is used in the Allstate policy.

The Tennessee Supreme Court has stated that "[t]he great weight of authority seems to be to the effect that a household means those living together under one roof, under one head and under the common control of one person." *Boyd v. Peoples Protective Life Ins. Co.,* 345 S.W.2d 869, 872 (Tenn.1961). While Allen did not have a key to his uncle's house and thus could not gain entry to the premises at his whim, his ability to leave the house was not subject to the control of his uncle. If he chose to leave, he did so. If he chose to spend the night elsewhere, he did so and without the permission or control of his uncle. He was not allowed to sleep in a downstairs bedroom although one was available. He cleaned up after himself. He made his own lunch. Sometimes he would buy his own food and put it in the refrigerator. While he ate with the family on some occasions, there were times that he ate alone. He did his own laundry. He was 25 years old and had been previously married. He was a transient adult living in the house of an uncle with whom he had only recently renewed an acquaintance after a separation of some 12 to 14 years. It seems to us that while Allen was in his uncle's house, he was not "in [his uncle's] household." The facts simply do not show that he was a member of the family unit under the control of Willard Barnes contemplated by the Allstate policy, as that concept has been defined in the appellate decisions of this state. *Boyd v. Peoples Protective Life Ins. Co.,* supra. *See also Permanent General Assurance Corp. v. Woods,* 1993 WL 157665 (Tenn.App.). As the *Gredig* case points out, "household" has had an established meaning in Tennessee jurisprudence since at least the time of the *Boyd* case. As defined by the cases, that term is not ambiguous. We hold that Allen was not "in [his uncle's] household," and hence was not covered by the Allstate policy.

■ We also believe that Allen's coverage cannot be sustained under the last of the three requirements in the Allstate policy. We do agree with the Appellants that the meaning of the policy language—"intention to continue to dwell therein"—is uncertain. The concept does not express a complete thought. "Intention to continue" calls out for a reference to time, and there is no such

4. The word "household" is not defined in the policy.

reference in the Allstate policy. Under the policy, for how long does one have to intend to reside at a given place before he or she has the necessary "intention to continue to dwell therein"? The policy does not tell us, or even suggest an answer. The failure to address this time element would seem to render the subject language ambiguous.

There does not appear to be a Tennessee appellate decision on point. The only reported appellate decision we have found that construes a provision substantially similar to the one in the Barnes' policy is a decision of an intermediate California appellate court. In State Farm Mutual Automobile Ins. Co. v. Elkins, 52 Cal.App.3rd 534, 125 Cal.Rptr. 139 (Cal.App.4 Dist.1975), the court was called upon to interpret the following definitional provision in two automobile liability insurance policies:

Resident or Reside—when used with reference to the named insured's household, means bodily presence in such household and an intention to continue to dwell therein. However, the named insured's unmarried and unemancipated children, while away from his household attending school, are deemed to be residents of his household.

Id. 125 Cal.Rptr. at 142. That court noted that the "definition is not free of ambiguity." Id. When it turned its attention to the phrase "an intention to continue to dwell therein," it observed that the provision "contains a certain inherent vagueness." Id. The court concluded that the language of the policies could be reasonably construed to include an unmarried, unemancipated teenage daughter of the insured who, at the time of her accident on July 31, while driving a vehicle owned by a friend, was living in an apartment as a tentative summer "experiment." She intended, with her family's promised help, to return to college full-time for the following fall semester. The court held that she was a "resident of the household" of her father, the insured, pointing out that she had taken 34 to 39 meals at her father's house during the six to eight weeks preceding the accident, occasionally stayed overnight at her parents' home, sometimes borrowed family vehicles, and had decided, prior to the accident, to move with her parents to Houston when her father was transferred there.

While the facts of the California case are very different from those in the instant case, that decision is authority for the proposition that the meaning of the policy language before us is unclear; but while the court in Elkins was able to place a reasonable interpretation on the language to include the insured's unmarried, unemancipated teenage daughter, despite her temporary residence away from home, our task is more difficult, given the facts before us.

We agree with the Elkins court that the language, "intention to continue to dwell therein," is ambiguous. We must next determine whether there is a reasonable interpretation of that language which would include Allen within the ambit of the coverage. This is the approach taken by the Tennessee Supreme Court in the case of Tata v. Nichols, 848 S.W.2d 649 (Tenn.1993). In that case, the Supreme Court construed provisions in two automobile insurance policies to determine if the uninsured motorist coverage afforded by those policies covered the injured party there who was crushed when an uninsured motorist collided with the rear of one of the covered vehicles. The injured party had been standing between the rear-ended vehicle and another insured vehicle as he and another individual attempted to "jump start" the rear-ended vehicle. At the time of the accident, the two vehicles were parked facing each other on the shoulder of the road. The issue in Tata was whether the injured party was covered under policies providing uninsured motorist protection for "anyone else occupying a covered auto ..." Id. at 650. (Emphasis in original). One of the policies defined "occupying" as "in, upon, getting in, on, out or off" the covered vehicle, while the other policy defined "occupying" as "in or upon or entering into or alighting from" a covered vehicle.

In Tata, the Court of Appeals had upheld the trial court's grant of summary judgment to the insurers, holding that the relevant language was not ambiguous and narrowly construing the language to exclude coverage for the injured party because he was outside the two vehicles. In reversing the decision

of the Court of Appeals and the trial court, the Supreme Court observed that:

> ... the *Court of Appeals* held that in the case at bar, the definitions of "occupying" contained in the policies were unambiguous and should be given their plain and ordinary meaning. The court found that because plaintiff was not actually "in," in the process of "getting in, on, out, or off," or "upon" either of the cars, he could not be considered an insured under the policies.
>
> \* \* \* \* \* \*
>
> The complete meaning of the term "upon," used in both policies to define "occupying," is uncertain. The many different meanings given the word in the cases which have considered this issue, demonstrate that the word has no precise meaning and is, therefore, sufficiently ambiguous under the circumstances of this case to require construction.
>
> \* \* \* \* \* \*
>
> Having determined that the term "upon" requires construction, the issue now is whether the plaintiff's activity in relation to Glidewell's Jeep and/or Horton's Nissan is encompassed by that term.

*Tata*, at 651. While the facts and issues of the *Tata* case are completely different from the ones before us, that case is instructive regarding the appropriate analysis of an insurance provision which is allegedly ambiguous. *Tata* teaches that a finding of ambiguity is not the ending, but rather the beginning of the coverage inquiry. Even if ambiguous, the questioned language must be susceptible to a **reasonable** interpretation which would include the individual seeking coverage under the policy.

In the instant case, the record reflects that Allen told the Allstate claims adjustor after the accident that he needed "at least 2 or 3 weeks or so" to get his life straightened out and move from his uncle's home. It is not clear from the record whether this time was in addition to the time he had already spent at his uncle's; but it is clear that Allen's state of mind—his intention—was that he would shortly be leaving his uncle's home. The head of the household, Willard Barnes, testified that he told Allen to be out by the end of September at the latest—a little over two weeks from the date of the accident. We agree with the trial court that it would be "ludicrous" to conclude that Allen's intent alone controls the scope of coverage under the Allstate policy. The intent of Mr. Barnes, who obviously could control when an adult nephew left his house, clearly impinged on Allen's intent as to how long he stayed at the house. He was a temporary resident— he had no furniture or other substantial possessions in his uncle's house. He had looked at other living accommodations with his father prior to the accident. We do not believe that there is any **reasonable** interpretation of "intent to continue to dwell therein" that would include a transient presence by a little-known relative which presence was to end in no more than two to three weeks' time. How can it be said that a state of mind to leave in a very short period of time can "co-exist" with an "intention to continue to dwell therein"? These are simply conflicting thoughts. One does not intend to go and intend to stay at the same time.

█ It is not necessary in this case to delineate a bright line rule for interpreting the policy provision at issue in this case. It is clear that a transient person such as Allen who is, in effect, preparing to dwell elsewhere in a very short period of time does not fall within a reasonable interpretation of the subject language. The evidence does not preponderate against the trial court's finding that the Allstate policy does not cover Allen.

For the foregoing reasons, the Judgment of the trial court is affirmed and this cause is remanded for collection of costs below. The costs of this appeal are adjudged against the Appellants and their sureties.

FRANKS, J., and CLIFFORD E. SANDERS, Senior Judge, concur.