746 P.2d 1045

**Elmer A. CURRIE and Bernadine Currie, husband and wife, Plaintiffs–Respondents,**

v.

**Ross O. WALKINSHAW and Vicki Walkinshaw, husband and wife, Defendants–Appellants.**

**No. 16691.**

Court of Appeals of Idaho.

Dec. 2, 1987.

---

tween two properties bordering the Spokane River in Kootenai County. The district court granted summary judgment quieting title in the Curries. The neighboring property owners, Ross and Vicki Walkinshaw, have appealed. The Walkinshaws contend the court should have granted summary judgment in their favor because they hold a superior interest in the property. Alternatively, the Walkinshaws assert that summary judgment was inappropriate because a contested question of material fact existed. We agree with the latter assertion and vacate the summary judgment.

We begin by reviewing the various conveyances relating to the property. Hazel Walkinshaw, Ross's mother, owned approximately twenty acres of land bordering the Spokane River in Government Lot 10 of the Southwest Quarter of Section 7 of Township 50 North, Range 4 West of the Boise Meridian. The relevant tracts of land are depicted in the accompanying sketch.

Dan J. Rude, Coeur d'Alene, for defendants-appellants.

A.L. Harstad, Coeur d'Alene, for plaintiffs-respondents.

WALTERS, Chief Judge.

Elmer and Bernadine Currie brought this action to quiet title to a strip of land be-

In 1968 Hazel conveyed Parcel A to Ross Walkinshaw. This warranty deed in part describes Parcel A as:

Beginning at the Northwest corner of Lot 10, Section 7, Township 50, North Range 4, West of Boise Meridian; 460

feet in an Easterly direction along the high water level of the Spokane River. Thence in a Southerly direction to the New Post Falls Highway District Right of Way. Thence in a Westerly direction along the New Post Falls Highway District Right of Way 425 feet to the West line of Lot 10, Section 7, Township 50, North Range 4, West of Boise Meridian. Thence in a Northerly direction along the West line of Lot 10, Section 7, Township 50, North Range 4, West of Boise Meridian to the point of beginning.

In 1975 Hazel deeded a half interest in Parcel B to Ross. The deed, recorded in Book 272 at page 16, describes Parcel B as:

Beginning at the Northwest corner of Lot 10, Section 7, Township 50, North Range 4, West Boise Meridian, 460 ft. more or less in an Easterly direction along the high water level of the Spokane River. This point being the true point of beginning. Thence continuing along the high water level of the Spokane River 200 ft., more or less, *to a point exactly midway between the Northeast and Northwest corners of Lot 10*, Sec 7, TWP 50, R 4, WBM. Thence in a Southerly direction 520 ft., more or less to the new Post Falls Hiway [sic] Dist. right of way known as East Riverview Drive. Thence in a Westerly direction along the North edge of East Riverview Drive 240 ft, more or less, to a point 425 ft, more or less, along the North edge of East Riverview Drive East of the West line of Sec 7, Lot 10, TWP 50, R 4, WBM. Thence in a Northerly direction 520 ft. more or less, to the true point of beginning. [Emphasis added.]

The emphasized phrase in the above description is at the center of this dispute.

Early in 1976 Hazel recorded another warranty deed conveying the same property to Ross and purporting to clarify the dimensions of those parcels of land previously granted. In this document Parcel A is described as:

The West 460ft. of Govt Lot 10, Sec 7, TWP 50, NR 4, WBM. lying North of the Post Falls Highway Dist. right ofway

[sic] known as East Riverview Drive. Dimensions as follows: Beginning at Spokane River and West line of Govt lot 10, Sec 7 TWP 50, NR 4, WBM South along line 606ft to Post Falls Highway Dist Right of way known as East Riverview Dr. Thence East along East Riverview Dr. 425ft. Thence North 525ft. to the Spokane River. Thence West along the Spokane River 460ft to the West line of Govt lot 10, Sec 7, TWP 50, NR 4, WBM., the point of beginning. [Punctuation original.]

and Parcel B as:

The west ½ of Govt Lot 10, Sec 7, TWP 50, NR 4, WBM. less the West 460ft. lying North of the Post Falls Highway Dist. Right of way known as East Riverview Dr. Dimensions as follows: Beginning at the Spokane River and mid-point of Govt lot 10, Sec 7, TWP 50, NR 4, WBM, 520ft. South to the North edge of East Riverview Dr. Thence 235ft West along East Riverview Dr. Thence 525ft. North to the Spokane River Thence 200ft. East along the Spokane River to the mid-point of Govt Lot 10, Sec 7 TWP 50, NR 4, WBM, The point of beginning. [Punctuation original.]

Hazel conveyed her remaining half interest in Parcel B to her daughter, Gwen Hood, on July 3, 1981. The description of the property in that deed did not materially differ from the language in the original Parcel B deed given to Ross.

Earlier, in April, 1974, Parcels E and F had been transferred to Gwen Hood. Also, on April 1 of 1976, Hazel had deeded the remainder of the property (Parcels C and D) to Hood. In relevant part, that deed recited:

That part of the East ½ of Government Lot 10, Section 7, Township 50 North, Range 4 W.B.M., Kootenai County, Idaho, lying North of the County Road; EXCEPT [Parcels E and F].

In 1982 Hood transferred her interest in Parcel C to the Curries. Apparently[1] Parcel C was then described as:

_____

1. A document conveying Gwen Hood's interest      in Parcel C to the Curries is not included in the

The West one-third, as defined by a line parallel to the West line int[e]rsecting a line drawn between the Northwest and Northeast corners at a point that lies one third by distance from the Northwest corner of that property lying in Government Lot 10, Section 7, Township 50 North, Range 4 West, Boise Meridian, Kootenai County, Idaho and described as follows:

Beginning at the Northeast corner of that property described in Book 272, Page 16, Kootenai County Deed Records [Parcel B], said point lying on the bank of the Spokane River; thence Easterly along the high water level of the Spokane River to the Northwest corner of that property described in Book 308, Page 782, Kootenai County Deed Records; thence Southerly along the West line of said property described in Book 308, Page 782 to the Southwest corner thereof, said Southwest corner lying on the North line of East Riverview Drive; thence Westerly along said North line to the Southeast corner of said property described in Book 272, Page 16; thence Northerly along the East line of said property described in Book 272, Page 16, to the Point of Beginning.

The Walkinshaws contend that the boundary between Parcels B and C is a line beginning at a point centered on a *straight* line between the northeast and northwest corners of Government Lot 10 and running southerly from the river to the county road. The Curries contend this boundary is anchored at a point equidistant from these corners along a *sinuous* line following the southern shore or high-water mark of the Spokane River. According to uncontested evidence in the record, the latter point lies approximately thirty feet further west of the midpoint claimed as a boundary by the Walkinshaws. The district court agreed with the Curries.

record. Because the Walkinshaws have not raised the issue, we assume the alleged document does convey Hood's interest to the Curries. The description is quoted from the Walkinshaws' appellate brief. The comparable de-

## I

## A

Ross and Vicki Walkinshaw argue that their deed to Parcel B clearly establishes their prior and superior interest in the disputed property and, therefore, the district court should have granted summary judgment in their favor. They contend the court erred by looking outside the four corners of the instrument to determine the grantor's intent. The district court concluded that the Walkinshaws' deed to Parcel B is ambiguous.

■ "In construing a deed the court should seek and, if possible, give effect to the intention of the parties." *Gardner v. Fliegel*, 92 Idaho 767, 770, 450 P.2d 990, 993 (1969). *See also Hogan v. Blakney*, 73 Idaho 274, 251 P.2d 209 (1952). If the language of a deed is plain and unambiguous the intention of the parties must be ascertained from the deed, and parol evidence, that is, documentary, oral or real evidence extrinsic to the deed itself, is not admissible to ascertain intent. *Gardner v. Fliegel, supra.* But inconsistencies in a deed may throw a shadow of ambiguity over an instrument, thereby warranting the introduction of parol evidence as an aid to discovering the intention of the parties. *Id.*

■ Thus, where a written instrument is clear and unambiguous, its interpretation is a matter of law. *Werry v. Phillips Petroleum Co.*, 47 Idaho 130, 540 P.2d 792 (1975). *See also Latham v. Garner*, 105 Idaho 854, 673 P.2d 1048 (1983). But where an instrument is ambiguous, interpretation of that instrument is a matter of fact for the trier of fact. *Latham v. Garner, supra.* The question whether an instrument is ambiguous is a question of law subject to free review on appeal. *See, e.g., Latham v. Garner, supra.* If an instrument is reasonably subject to conflicting interpretations, it is ambiguous, and its construction is a question of fact. *Rutter*

scription in the Curries' complaint does not appear to be accurate. The Curries have not raised objection to the description quoted in the Walkinshaws' brief. Therefore we assume it accurately reflects the original document.

*v. McLaughlin,* 101 Idaho 292, 612 P.2d 135 (1980).

■ The description of Parcel B begins with a call of "along the high water level" of the river "to a point exactly midway between the Northeast and Northwest corners of Lot 10, ..." In a property description, marked corners are conclusive. They control over courses and distances. 6 G. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 3049 (1962). Apparently, the northeast and northwest corners of Lot 10 are marked by a fence-post and iron pipe, respectively. Ordinarily this call would be unambiguous.

However, this is not an ordinary tract of land. Government lots are portions of square-mile sections surveyed and established by the United States Government because they do not conform to the ordinary standards for quarter-quarter sections. *See* BUREAU OF LAND MANAGEMENT, MANUAL OF INSTRUCTION FOR THE SURVEY OF THE PUBLIC LANDS OF THE UNITED STATES § 3–79 (1973). *See generally* F. CLARK, A TREATISE ON THE LAW OF SURVEYING AND BOUNDARIES Ch. 11 (J. Grimes 4th ed. 1976). Such fractional sections often are remainders or oversized areas resulting from laying a flat grid system upon a round planet. In other cases they result where section lines lie near bodies of water. There, fractional lots are created so boundaries lie along and follow the curves of the shoreline, thus providing as many lots as practical with substantial water frontage. F. CLARK, *supra* § 214. The north line of Government Lot 10 is such a boundary.

With respect to property lines, the following principles apply:

> A course or line given in a deed is presumably a straight line; but this presumption does not hold when there is anything to show that the course is to be determined by a fixed monument, such as a wall; and even a line extending beyond the line of such wall may be deflected from a straight line in order to conform to the distance given for the

next boundary line. A call in the description of a survey for the marked line of another survey between designated points which was not a straight line, but consisted of several lines and marked corners is sufficient. A line should be construed, if possible, to mean a continuous line, and should not be deflected except in order to conform to the intention of the parties. A "meander line," whether state or national, is not considered a boundary line, but is used only for determining the acreage for which a charge should be made when title is transferred to private parties, as well as for convenience. A meander line is not a boundary, but the water of the body which is meandered is the true boundary, regardless of whether the meander line coincides with the shore line. A boundary line presumably runs straight across between known corners. [Footnotes omitted.]

6 G. THOMPSON, *supra* § 3054.

Consequently, the Curries pose the reasonable argument that the "midpoint" between the northern corners of Government Lot 10 is to be found by following the shoreline of the Spokane River, whereas the Walkinshaws reasonably contend that a straight line was intended. An examination of the remainder of the description in Walkinshaws' deed to Parcel B is also inconclusive. The first call being measured "along the high water level" supports the Curries' interpretation. But the fact that this measurement is slightly shorter than the measurement in the straight southern boundary call of Parcel B supports the Walkinshaws' interpretation. The second, purportedly clarifying, deed to Parcel B filed in 1976 is of little aid as it also includes the undefined term "midpoint."

Resort to a literal interpretation of the language of the deeds fails to resolve the dispute between these equally reasonable contentions. Webster defines "midpoint" as:

> a point on a line segment *or* an arc of a curve whose distances from the end points measured along the segment or arc are equal[.]

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1431 (1976) (emphasis added).

Our examination of the instruments conveying half-interests in Parcel B to Ross Walkinshaw and to Gwen Hood leads us to concur with the district court's conclusion that the property descriptions are ambiguous. Thus, the court was entitled to resort to extrinsic evidence to determine the intent of the grantor. This brings us to the Walkinshaws' second issue—that the trial court erred by not granting summary judgment to the Walkinshaws.

## B

The Walkinshaws contend that their summary judgment motion should have been granted because the Curries failed to establish any interest in the disputed property. Apparently the Curries' claim of title is derived from Gwen Hood. *See* note 1, *supra.* Hazel Walkinshaw granted Hood the "east half" of that portion of Lot 10 lying between the river and the county road. The Walkinshaws contend that even if their title is not as extensive as they assert, Hood's title solely included the east half of the lot and did not extend to the line running southerly from the shoreline midpoint. A party seeking to quiet title must succeed on the merits of his own title and may not rely solely upon the weakness of an adversary. *Aldape v. Akins*, 105 Idaho 254, 668 P.2d 130 (Ct. App.1983). Therefore, the Walkinshaws contend that the Curries could not prevail in this action.

The Walkinshaws' argument does have merit.

Ordinarily a conveyance of half of a tract of land will be construed as a conveyance of a half in quantity, and a like rule has been recognized where other fractional units are referred to; but there is no universal rule that a conveyance shall be so interpreted; and, where the intent of the parties to employ the term "half" as describing a particular tract other than a half in quantity is apparent from the context or surrounding facts and circumstances, it will be given such meaning. [Footnotes omitted.]

26 C.J.S. *Deeds* 901, § 104(f) (1956). *See generally* 6 G. THOMPSON, *supra* § 3056.

Exceptions to the rule occur in a variety of circumstances. For example, in *Brewer v. Schammerhorn*, 183 Kan. 739, 332 P.2d 526 (1958), a deed conveyed "precisely" eighty acres in the northern half of a quarter section which contained 163 acres. A subsequent deed from the same grantor conveyed the south half of the quarter section. The court held that the second grantee took eighty-three acres, about one and one-half acres of which did not literally lie within the south half. The court relied upon the presumption that a grantor intends to convey his entire interest, and a deed will convey that interest unless something appears to limit it to a lesser interest. The court's examination of extrinsic evidence revealed no such limit.

We believe a similar approach is applicable here. If Hazel Walkinshaw conveyed only her interest in the western portion of the tract extending to a line running south from the shoreline midpoint, then the deed for Parcel C may be presumed to convey her remaining interest in an eastern half extending to that same line. If so, Hood obtained an undivided interest in the disputed strip, which was then conveyed to the Curries. This, of course, depends upon the ultimate facts to be found by the trial court. Because the facts regarding intent are not yet fully developed, and appear likely to be disputed, we hold that the district court correctly denied Walkinshaws' summary judgment motion.

## II

Finally, we turn to the Walkinshaws' assertion that the district court erred by granting summary judgment to the Curries. The Walkinshaws assert that material disputed questions of fact remained. The Walkinshaws contend that the court improperly resolved these questions without according them an evidentiary hearing.

In support of their motion for summary judgment, the Curries submitted an affidavit from Gwen Hood stating that on or

before 1973 Ross, Daryl Hood and she met at Hazel's house and agreed to base the property division upon the midpoint of the shoreline. The Curries presented Hood's affidavit as evidence of Hazel Walkinshaw's intent. The Curries also presented evidence that—prior to execution of the deeds—a surveyor had established and marked the shoreline midpoint.[2] However, they do not argue that any oral agreement constituted an oral contract conveying title, since such an agreement would be barred by the statute of frauds. *See* I.C. § 9–505.

The district court noted that Ross Walkinshaw denied such an agreement was reached, but that he did not suggest a specific alternative method of determining the midpoint. Relying upon *Riverside Development Co. v. Ritchie*, 103 Idaho 515, 650 P.2d 657 (1982), for the authority to resolve the question, the court found that it was Hazel Walkinshaw's intent to divide the property on a line extending southerly from the shoreline midpoint at an angle bisecting the angle between the east and west boundaries of Lot 10. Accordingly, the court entered summary judgment for the Curries.

■ Ordinarily, summary judgment is appropriate only when—after the pleadings, depositions, admissions, and affidavits have been construed most favorably to the opposing party—there is no genuine issue of material fact. I.R.C.P. 56(c); *Moss v. Mid–America Fire and Marine Insurance*, 103 Idaho 298, 647 P.2d 754 (1982). The fact that both parties move for summary judgment does not demonstrate there is no disputed material issue of fact. *Id.* In *Ritchie* our Supreme Court carved out a narrow exception to the general rule. The Court held that "where the evidentiary facts are not disputed and the trial court rather than a jury will be the trier of fact, summary judgment is appropriate, despite the possibility of conflicting inferences because the court alone will be responsible for resolving the conflict between those inferences." *Id.* at 519, 650 P.2d at 661.

The Curries contend that here the court was free to draw the most probable inference from the record because the evidence was entirely documentary. In *Argyle v. Slemaker*, 107 Idaho 668, 670–71, 691 P.2d 1283, 1285–86 (Ct.App.1984) we held that, "where ... the evidence is entirely confined to a written record, there is no additional, in-court testimony to be obtained, and the trial judge alone will be responsible for choosing the evidentiary facts he deems most probable ... such a choice can be made on summary judgment." As we also stated in *Argyle*, if *Ritchie* is properly applied, our standard of review is whether the record is sufficient to support the district court's findings. However, the question whether the *Ritchie* exception is applicable is a question of law upon which we exercise free review.

Here, the court correctly concluded that the Parcel B deed was ambiguous. Therefore, extrinsic evidence of the grantor's intent was admissible. A principal item of evidence would have been the testimony of Gwen Hood regarding the intent expressed by Hazel Walkinshaw at a meeting attended by Ross Walkinshaw prior to executing the deed. However, Ross Walkinshaw's answer denied any agreement. In his affidavit in opposition to the Curries' summary judgment motion, he states that he does not recall any agreement being reached.

We conclude that *Ritchie* was inappropriately applied to the instant case. Since the Walkinshaws opposed the summary judgment motion, the pleadings and affidavits must be construed in a light most favorable to them. *Gebrueder Heidemann, K.G. v. A.M.R. Corp.*, 107 Idaho 275, 688 P.2d 1180 (1984). Ross Walkinshaw's statement regarding the crucial meeting may be construed as simply a lack of recollection, or it may be construed as an assertion that Hazel expressed no such intent. The latter construction would create a material issue of fact. Nor did Hood expressly state that Hazel Walkinshaw was present at the

**2.** In response to this evidence, the Walkinshaws pose an interesting query: Why didn't the deeds refer to the survey or to the markers installed by the surveyor, and why didn't the deeds use the exact distance (747.5 feet) found by the surveyor as the length of each half of the shoreline? Perhaps these questions will be explored on the remand of this case.

meeting in question. Additional in-court testimony relating to this issue could have been obtained from the participants.

In their position as opponents to a summary judgment motion the Walkinshaws are to be accorded the more favorable reasonable construction of the affidavits and pleadings. Therefore, we hold that whether Hazel Walkinshaw expressed an intent to divide the property at the shoreline midpoint was a disputed question of fact, and not merely an inference to be drawn from a fact. The weight to be given this significant piece of evidence turns upon the credibility of two participants in a single event. The determination of the credibility of these witnesses is properly for a trier of fact following an evidentiary hearing.

In *Ritchie*, the Idaho Supreme Court distinguished *Moss* and stated:

> Because the contractual standard itself was ambiguous, the elements of that standard rested upon the intent of the parties and therefore formed a question of fact and not law. [Citations omitted.] The summary judgment in *Moss* was thus reversed, because the ultimate question of whether Moss made "regular and frequent" trips was itself not sufficiently defined to permit the question to be answered without evidence showing the meaning which the parties intended to give to the phrase "regular and frequent."

*Id.* 103 Idaho at 519, 650 P.2d 657, 661. Here, the same could be said for the term "midpoint." [3] As in *Moss*, extrinsic evidence was offered to aid in interpreting an ambiguous document. The underlying facts guiding the court's interpretation of the document were in dispute, and thus summary judgment was inappropriate.

Therefore, we set aside the summary judgment and remand the case for further proceedings. No attorney fees awarded on appeal. Costs to appellants, Walkinshaws.

BURNETT, Judge, specially concurring.

I join in holding that the deed describing the eastern boundary of parcel B is ambiguous. Consequently, I disagree, with due respect, with the contrary view expressed *infra* by Judge Swanstrom. He finds no ambiguity because he focuses on the phrase, "to a point exactly midway between the Northeast and Northwest corners of Lot 10." He argues that there can be only one such point. This would be true if the point were located on a straight line connecting the two corners of Lot 10. But such a point would be somewhere in the Spokane River. The deed itself precludes this unlikely result. The deed states that the point is located "along the high water level of the Spokane River...."

Thus, the deed apparently refers to a point on the river bank. The point may be measured halfway along the irregular course of the river between the two corners of Lot 10. Or the point may be located where the river bank would be intersected by the perpendicular bisector of a straight line connecting the two corners. It may even be located where the river bank meets a bisector which is not perpendicular to the line connecting the corners but is parallel to the east and west boundaries of Lot 10. All of these possible points are located "along the high water level of the Spokane River." Each point arguably is "midway between the Northeast and Northwest corners of Lot 10." But the points do not coincide. Accordingly, the deed is ambiguous.

---

3. It appears there are three basic ways Hazel could have intended that the property be divided: (1) by a line anchored on the north end at the midpoint of the meandering shoreline; (2) by a line anchored at the straight line midpoint between the northern Lot 10 corners; or (3) by a line dividing the area between the road and river into two equal acreages. Each of these interpretations is subject to further variations because the line may then be (A) run due south; (B) anchored on the south end to a point determined by southern boundary calls; (C) run parallel to either the east or west boundary of Lot 10; or (D) run on a line bisecting the angle between the east and west sides. *See generally* F. CLARK, A TREATISE ON THE LAW OF SURVEYING AND BOUNDARIES § 196 (J. Grimes 4th ed. 1976); BUREAU OF LAND MANAGEMENT, MANUAL OF INSTRUCTION FOR THE SURVEY OF THE PUBLIC LANDS OF THE UNITED STATES § 3–90, 86 (1973).

A remand is required to construe the deed by employing extrinsic principles of construction or by ascertaining the underlying intent. Judge Swanstrom's opinion, in effect, undertakes such an analysis. For that reason it will be of interest to the district court on remand.

SWANSTROM, Judge, specially concurring.

I concur in vacating the summary judgment granted to the Curries. I also concur in the remand, because, in any event, the district court may have to approve a survey to ultimately resolve the dispute. However, I believe that on the present record, the Walkinshaws are entitled to summary judgment in regard to the meaning of the deeds in question. My reasons are as follows.

The resolution of this dispute is controlled entirely by the eastern boundary of Parcel B. The placement of that boundary determines exactly where the western boundary of Parcel C, the Curries' parcel, lies. There can be no overlap and no gap between the two parcels. This is so because the boundaries of Parcel B were established before the boundaries of Parcel C. More importantly, the deed by which Gwen Hood conveyed Parcel C to the Curries in 1982 clearly makes the western boundary of Parcel C coincide with the eastern boundary of Parcel B. The effect of the description used in conveying Parcel C is to make the boundaries of Parcel C dependent upon and subordinate to the true eastern boundary of Parcel B. To this extent, at least, the Walkinshaws' contention is correct; their interest in Parcel B is "superior" to the Curries' interest in Parcel C.

In the deed to Parcel B recorded in Book 272 at page 16 is the one phrase about which the dispute is centered. The phrase is "to a point exactly midway between the Northeast and Northwest corners of Lot 10." This phrase describes a single point that is easily located both on the ground and on a plat with mathematical certainty. As discussed later, it is immaterial whether this midpoint is thought of as being on a single straight line, on a series of short straight lines comprising a true meander line, or on a sinuous high-water mark. The fact remains, however, that unless the point in question will always fall on a straight line drawn from corner to corner, the point will not be "exactly midway *between*" the two designated corners of Lot 10. By definition, the point must also be equidistant from the two corner points. Here, according to the record, the two corner points are marked and are not disputed. Thus, a point "exactly midway between" the two corners is fixed and certain. There is only one point on the face of the earth that fulfills the description. The point is precise and permanent; it will never change with time regardless of how the river banks might change from year to year.

The Curries find ambiguity in the description by looking to the described course coming to the point in question. That course is described as being "along the high water level of the Spokane River 200 ft. more or less." They argue that this language suggests an intention of the grantor to use the midpoint of a sinuous line surveyed exactly along the high-water mark of the river. Using such a midpoint gains them a few extra feet in their "half" of Lot 10. They must first concede that their suggested "midpoint" does not fall "exactly midway between" the two corners or there would be no dispute and no claimed ambiguity.

It should be noted first that the course "along the high water *level* of the Spokane River 200 ft. *more or less*" (emphasis added) is not a precise course and distance. Taken in context with the entire description, it cannot be said that this particular call is intended to be controlling or even of equal "dignity" to the precise point defined as its terminus. The principle involved is well recognized.

Precise and general descriptions irreconcilable.—If there is a precise and perfect description showing that the parties actually located the land upon the earth and another general in its terms, and they cannot be reconciled, the latter

should yield to the former. This is in accordance with the general rule that generalities always yield to precise language.

F. CLARK, A TREATISE ON THE LAW OF SURVEYING AND BOUNDARIES § 330 (J. Grimes 4th ed. 1976) (hereafter CLARK). Thus, where the language that gives rise to an "ambiguity" must yield to other more precise language, in reality there is no ambiguity.

Secondly, it is a mistake to say that in order to give meaning to the phrase we must hold that the grantor, Hazel Walkinshaw, intended a line would be literally snaked along the high-water mark, following every sinuousity of the river and then divided along its length. The Curries urge this unusual meaning to the phrase, reading into it far more than is commonly intended.

It is not disputed here that the *actual* northern boundary of each of the described parcels is the mean high-water mark of the Spokane River. Actual boundaries can fluctuate from year to year as the river alters its banks slightly or greatly. *See, e.g.,* 6 G. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 3054, quoted earlier in the main opinion; and CLARK, §§ 263, 265. It is neither necessary nor practical for surveyors to attempt to follow and reproduce all of the minute windings of the high-water mark. Indeed, surveyors are directed to use less complex methods to describe riparian property. CLARK, *supra.*

> The running of a boundary line by courses and distances along the bank of a river will not prevent the water from being the boundary in accordance with the normal rules regulating boundary lines on navigable and nonnavigable rivers. Indeed, it may be considered a canon in American jurisprudence that where the calls in a conveyance of land are for two corners at, in, or on a stream or its bank and there is an intermediate line extending from one such corner to the other, the stream is the boundary, unless there is something which excludes the operation of this rule by showing that the intention of the parties was otherwise. [Footnotes omitted.]

12 AM.JUR.2D *Boundaries* § 27 (1964) (quoting in part *St. Louis v. Rutz,* 138 U.S. 226, 243, 11 S.Ct. 337, 343, 34 L.Ed. 941 (1891)).

Thus, I believe that it is immaterial whether the point selected by Hazel Walkinshaw falls on the mean high-water mark. In fact, the point may be above or below the mean high-water mark. If the point is found to be within the high-water marks of the river, witness markers may be set in safe locations according to the prescribed surveying practices.

From the described precise point the description goes on as follows. "Thence in a Southerly direction 520 ft., more or less to the new Post Falls Hiway [sic] Dist. right of way known as East Riverview Drive." This course is not ambiguous as to its direction and the distance called for here plays no part in this dispute. "General compass terms such as 'northerly,' 'westerly,' etc., where there is no monument or other object to direct the inclination to another compass point, must be construed to mean north or west." CLARK, § 338. Nothing in the deed suggests that "southerly" was intended to mean anything but "south."

In summary, I believe that the controlling points used to describe Parcel B are not ambiguous. Accordingly, the trial court should have no need to accept extrinsic evidence of the grantor's intention concerning the eastern boundary of Parcel B.