811 P.2d 507

**AID INSURANCE COMPANY (MUTUAL), a foreign corporation, Plaintiff–Respondent,**

**v.**

**James ARMSTRONG and Margarette Armstrong, husband and wife; Becky Armstrong; and Farm Bureau Mutual Insurance Company of Idaho, Inc., a corporation, Defendants,**

**and**

**Arletta Joyce Inskeep, guardian ad litem, on behalf of Martie Raylene Shelman, a minor, Defendant–Appellant.**

**No. 18138.**

Court of Appeals of Idaho.

May 14, 1991.

---

Blaser & Sorensen, Blackfoot, for defendant-appellant. Murray J. Sorensen, argued.

Peterson, Moss, Olsen, Meacham & Carr, Idaho Falls, for plaintiff-respondent. William C. Carr, argued.

## SUBSTITUTE OPINION

The Court's prior opinion dated May 3, 1991, is hereby withdrawn.

WALTERS, Chief Judge.

This is an appeal from a summary judgment in favor of plaintiff AID Insurance Co. in which the district court ruled that Becky Armstrong Allhouse had no coverage under her stepfather's home owner's insurance policy because she was not a resident of his household at the time she accidentally shot Martie Shelman in the eye with a BB gun. Martie Shelman, with her guardian ad litem Arletta Joyce Inskeep, appeal. We affirm.

### Facts

Becky Armstrong Allhouse (Becky) was born in 1967 to James Armstrong (James) and Loanna O'Donnell (Loanna). James and Loanna divorced in 1978 and Loanna was awarded legal and physical custody of Becky, with James allowed reasonable visitation. Loanna married Jim O'Donnell

(Jim) and went to live with him in Rupert, Idaho. James also remarried, and he and his wife Margarette live in Aberdeen, Idaho.

From the divorce in 1978 until shortly before the shooting accident in 1983, Becky lived with the O'Donnells. She saw her father James only periodically, except for a several-month stay at his house in 1982. Over time, the relationship between Becky and the O'Donnells became severely strained. The O'Donnells decided that in August of 1983, Becky, then a minor, would go to live with her natural father James. On November 13, 1983, while living at James' house, Becky accidently shot Martie Shelman, also a minor, in the left eye with a BB gun, causing Martie to be declared legally blind in that eye. Within two weeks, Becky went back to live with the O'Donnells.

### Procedure

Martie Shelman, with her guardian ad litem, Arletta Joyce Inskeep (Inskeep), settled with James Armstrong's liability insurer, and then sought relief from the O'Donnells' insurer, AID Insurance Co. (AID). AID agreed to defend the O'Donnells under a reservation of rights to deny coverage if the trial court, in a declaratory judgment action instituted by AID, found that Becky was not an "insured" under the O'Donnell policy at the time of the accident because she was not a "resident" of that household.

Both parties moved for summary judgment. Both motions were denied. The court set a date for trial.[1] Subsequently, AID moved for reconsideration of its motion for summary judgment and was joined in that motion by Inskeep. The court granted summary judgment in favor of AID.

### Standard of Review

Summary judgment is proper only when there is no genuine issue of material

---

1. Although the court set the case for trial before a jury, neither party had timely requested a

jury, so far as the record discloses.

fact and the moving party is entitled to judgment as a matter of law. I.R.C.P. 56(c); *Anderson v. City of Pocatello,* 112 Idaho 176, 179, 731 P.2d 171, 174 (1986); *Boise Car & Truck Rental Co. v. Waco, Inc.,* 108 Idaho 780, 783, 702 P.2d 818, 821 (1985); *Maxwell v. Women's Clinic, P.A,* 102 Idaho 53, 55, 625 P.2d 407, 409 (1981). On appeal we exercise free review in determining whether a genuine issue of material fact exists. *Edwards v. Conchemco, Inc.,* 111 Idaho 851, 852, 727 P.2d 1279, 1280 (1986). When reviewing the decision of the lower court, this Court will construe the facts in the record and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Ethington,* 103 Idaho 658, 660, 651 P.2d 923, 925 (1982).

Usually, when ruling on a motion for summary judgment, the court is not permitted to weigh the evidence or to resolve controverted factual issues. *Altman v. Arndt,* 109 Idaho 218, 221, 706 P.2d 107, 110 (Ct.App.1985). However, if the court will be the ultimate fact finder and if both parties move for summary judgment, basing their motions on the same evidentiary facts, theories, and issues, then summary judgment is appropriate even though conflicting inferences are possible, so long as all the evidence is confined entirely to the record. *Currie v. Walkinshaw,* 113 Idaho 586, 592, 746 P.2d 1045, 1051 (Ct.App.1987).

In the instant case, both parties moved for summary judgment based on the same evidentiary facts and on the same theories and issues, effectively stipulating that there was no genuine issue of material fact. *Riverside Development Co. v. Ritchie,* 103 Idaho 515, 518, 650 P.2d 657, 660 (1982). The trial court issued a memorandum opinion in favor of AID based on the arguments, pleadings, and depositions of both parties. The court held that the undisputed facts enabled it to determine as a matter of law whether Becky was an insured under the terms of the AID/O'Donnell policy at the time of the accident. "[U]nder certain clear cut factual patterns" the determination of whether one is, for the purposes of insurance coverage, a resident, is a question of law.

*Government Employees Insurance Co. v. Dennis,* 645 P.2d 672, 677 (Utah 1982). In other words, the pertinent facts involved in this appeal were fully developed through depositions and are not disputed. The court was not precluded from adjudicating the legal consequences to be drawn from undisputed facts. *Miller v. U.S.F. & G. Co.,* 127 N.J.Super. 37, 316 A.2d 51, 53 (1974). Still, we will freely review the merits of the district court's decision to see if there was a genuine issue of material fact as to whether Becky was a resident of the O'Donnell household at the time of the accident.

### Discussion

The Idaho Supreme Court has held that insurance policies are contracts of adhesion, not subject to negotiation between the parties, and that any ambiguity must be construed most strongly against the insurer. *Kromrei v. AID Insurance Co. (Mutual),* 110 Idaho 549, 551, 716 P.2d 1321, 1323 (1986). However, where the policy language is clear and unambiguous, coverage must be determined according to the plain meaning of the words employed. *Id.; Meckert v. Transamerica Insurance Co.,* 108 Idaho 597, 601, 701 P.2d 217, 211 (1985); *Miller v. Farmers Insurance Co.,* 102 Idaho 132, 136, 627 P.2d 311, 315 (1981). The court must determine what a reasonable person in the position of the insured would have understood the language to mean. *Kromrei,* 110 Idaho at 551, 716 P.2d at 1323; *Permann v. Nationwide Insurance Co.,* 108 Idaho 192, 194, 697 P.2d 1206, 1208 (1985); *Burgess Farms v. New Hampshire Insurance Group,* 108 Idaho 831, 834, 702 P.2d 869, 872 (Ct.App. 1985). Unless a contrary intent is shown, common, non-technical words are given the meaning applied by laymen in daily usage—as opposed to the meaning derived from legal usage—in order to effectuate the intent of the parties. *Government Employees Insurance Co.,* 645 P.2d at 675.

The O'Donnell insurance policy provides personal liability coverage for Jim O'Donnell as the named insured and "if residents of the Named Insured's household, his spouse, the relatives of either, and any

other person under the age of twenty-one in the care of any Insured...." Thus, the focus of our analysis is upon the meaning of the terms "resident" and "household."

■ Most courts interpret the phrase "resident of the same household" to extend coverage if this can be done under a reasonable interpretation of the facts. *Government Employees Insurance Co.,* 645 P.2d at 674. If any doubt exists, the language of the policy will be interpreted against the insurance company and in favor of coverage. *Id.; General Motors Acceptance Corp. v. Grange Insurance Assoc.,* 38 Wash.App. 6, 684 P.2d 744, 746–747 (1984). If an insurance policy may be given either of two reasonable meanings, one which permits recovery and one which does not, the meaning more favorable to the insured should be adopted. *Bonner County v. Panhandle Rodeo Ass'n,* 101 Idaho 772, 620 P.2d 1102 (1980); *Ferrel v. All-state Ins. Co.,* 106 Idaho 696, 698, 682 P.2d 649, 651 (Ct.App.1984).

■ The term "resident" has been said to connote a living arrangement with some degree of permanence, while "household" has been held to mean residents who dwell under the same roof and compose a family. *General Motors Acceptance Corp.,* 684 P.2d at 747. Whether a person is a resident of a particular place is to be determined from all the facts of each particular case, not from facts viewed in isolation from one another. 77 C.J.S. RESIDENT, at 307 (1952). The meaning of the term depends on the context in which it is used. *Government Employees Insurance Co.,* 645 P.2d at 674. The same is true of the phrase "resident of the same household." *Pierce v. Aetna Casualty & Insurance Surety Co.,* 29 Wash.App. 32, 627 P.2d 152, 154 (1981); *General Motors Acceptance Corp.,* 684 P.2d at 746.

In deciding this case, we have found instructive the decisions of several other jurisdictions. For example, in *Mid–Century Insurance Co. v. Duzykowski,* 131 Ariz. 428, 641 P.2d 1272 (1982), a liability insurer sought a declaration that its uninsured motorist policy did not cover an accident caused by the named insured's daughter.

The trial court granted summary judgment for the insurer, and the victim, through her guardian ad litem, appealed. The Supreme Court of Arizona affirmed, finding that the daughter was not a resident of the named insured's household. The court determined that although several states have found the phrase "resident of the same household" to be ambiguous, Arizona did not, and the term must be interpreted according to its ordinary meaning. *Id.* 641 P.2d at 1274. Still, whether the daughter was a resident of the insured's household was a question of fact. *Id.* Several factors the court considered were the daughter's presence in or absence from the named insured's household at the time of the accident; the reasons for the daughter's absence; the relationship of the daughter to the named insured; living arrangements in earlier time periods; and the daughter's subjective or declared intent with respect to her residence. *Id.*

The Arizona court, applying these factors, found that the daughter's expressed intent was to leave the insured's house and not return. She had turned eighteen years-old five weeks before the accident and had announced her intent to marry. She removed almost all of her possessions from her mother's house, but the daughter kept a key to that home and occasionally returned to visit, eat, and pick up her mail. She spent nights at her fiance's parent's house. Further, she stated that at the time of the accident she did not expect to return to her mother's house to live, although she did return a year later after her divorce. From these factors the court concluded that there was no material issue of fact that precluded summary judgment in favor of the liability insurer.

■ In this case, the evidence submitted on summary judgment was virtually uncontroverted that Becky's intent at the time she went to live with her father was to remain with him until she became an adult. She stated in her deposition that she intended and understood that she would stay at James' permanently. Further, she stated that in a discussion with Loanna it was pointed out that if she went

to James's that "I [Becky] was going for good." James said in his deposition that he intended to have his daughter live with him permanently if he could "straighten her out;" otherwise, he did not want her to live there. She intended to finish school while living with him in Aberdeen. She had taken all of her belongings to her father's house when she moved in with him in August.

Jim O'Donnell's testimony and that of James Armstrong agree that a first visit to the Armstrong's in 1982 was a trial visit to see if Becky really was going to live with her natural father. Jim O'Donnell further testified that "the last time she was supposed to live there [with James] the rest of her life or whatever, you know, until she became an adult. The second time was not just a visit."

Loanna testified that the first visit was a trial visit and was Becky's idea, but the second visit "she was to live there [at the Armstrong's] until she was 18 years old." Loanna stated that Becky took all of her belongings with her to Aberdeen, and that her sister took over her room in Rupert and no room was kept for Becky's use if she were to return. Loanna said that she understood that James Armstrong was to be legally responsible for Becky. Loanna had legal and physical custody of Becky, but she had sent James a stipulation to modify custody so that he would have more control over Becky, one of his stated prerequisites for taking her. The stipulation would have transfered custody of Becky from Loanna to James, but he initially refused to sign it because he disagreed with its language. He did not sign the stipulation until after it had been revised and after Martie Shelman was injured.

■ Courts in several jurisdictions have held that a person, whether a minor or an adult, may be a resident of more than one household for insurance purposes. *See* *Mutual Service Casualty Insurance Co. v. Olson,* 402 N.W.2d 621 (Minn.App.1987); *Londre v. Continental Western Insurance Co.,* 117 Wis.2d 54, 343 N.W.2d 128 (App.1983); *Hartford Casualty Insurance Co. v. Phillips,* 575 S.W.2d 62 (Tex.Civ.

App.1978). What those decisions tend to reveal, however, is a closer continuing connection between the person sought to be insured and the named insured than is evident in this case.

For instance, in *Mutual Service Casualty Insurance Co.,* the son of divorced parents accidentally shot a friend. The insurance company sought a declaratory judgment to determine whether the son was a resident of his non-custodial mother's household and therefore an insured under her policy. The trial court found that he was, and the Court of Appeals affirmed. The appellate court looked to the close proximity of the parents' homes within the same town, the fact that the son spent most weekends at his mother's house, that he sometimes slept at his mother's house during the week, and the fact that he spent the preceding three summers with his mother. The son had a key to his mother's house, his own bedroom there, and kept clothes and other personal property there. The court found that the son was living in a close, intimate and informal relationship with both parents at both residences and was a resident of both households.

Here, although Loanna was the custodial parent at the time of the accident, the record does not indicate that Becky had such a continuing close connection to the O'Donnell household that she would have a reasonable expectation of receiving insurance coverage under the O'Donnell policy. The O'Donnells and the Armstrongs lived over 50 miles apart. Even though Becky had lived with the O'Donnells since the divorce, she left that household intending never to go back. She did not stay there at all during her time with the Armstrongs and she kept none of her personal belongings at the O'Donnells' home. No bedroom was kept for her to return to.

In *Londre,* divorced parents were sued to recover for the injuries caused by their son when he hit a friend in the eye with a stick. The trial court denied the non-custodial father's insurance company's motion for summary judgment but the Wisconsin Court of Appeals reversed, holding that the

son was not a resident of the father's household at the time of the accident.

Both parents in *Londre* remarried after their divorce and maintained separate homes twenty miles apart. The mother had primary physical and legal custody and the father exercised his visitation rights on weekends and over several weeks in the summer. At the time of the accident, the son was living with his mother. Though the father and son enjoyed a close, intimate, informal relationship, they visited each other irregularly, and the son was not an integrated member of his father's household. The son stated that at the time of the accident he considered his mother's house to be his home. The mother also testified that she considered the son's home to be hers and not his father's.

The court in *Londre* held that no single factor constituted the controlling test as to whether a person is a resident of a household for insurance purposes. *Londre*, 343 N.W.2d at 130. Further, physical absence coupled with the intent not to return was sufficient to sever the absent person's membership in the household. *Id.* at 131. The court determined that the son's absence from his father's house combined with his intent not to return, plus his expression that he considered his mother's house to be his home, severed his membership in his father's household. The court recognized that although a person could be a resident of two households at one time, the facts in *Londre* did not support such a conclusion.

 Likewise, the facts in the case at hand do not support such a conclusion. Becky and the O'Donnells considered Becky's home to be with the Armstrongs. Though Loanna had legal and physical custody of Becky at the time of the accident, the accident occurred while Becky was not in the O'Donnells' care. Custody is just one of the many factors to consider when determining a child's residence. *Londre, supra; Mutual Service Casualty Ins. Co., supra.* All the evidence on the issue of intent indicates that Becky's intent was to remain with the Armstrongs. Becky was living with the Armstrongs at the time of

the accident. Although Becky returned to live with the O'Donnells shortly after the accident, the district judge was free to arrive at the most probable inference as to what Becky's intent was at the time of the accident, the event triggering the demand for coverage.

### Conclusion

We find no evidence in the record to demonstrate any genuine issue of material fact that would preclude a summary judgment in favor of AID. Becky's intent and understanding, as well as the intent and understanding of Jim and Loanna O'Donnell, was that Becky was to be a permanent resident of the Armstrong household, not the O'Donnell household, when the accident occurred. We hold that the trial court properly construed the undisputed facts when it held as a matter of law that Becky was not a resident of the O'Donnell household at the time of the accident.

The judgment is affirmed. Costs to respondent, AID Insurance Co. No attorney fees on appeal. *See Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979).

SWANSTROM and SILAK, JJ., concur.