IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 36607

FARM BUREAU INSURANCE COMPANY )
OF IDAHO, )
)
   Plaintiff-Respondent, )
)
v. )
) **Boise, June 2010 Term**
JAMEY KINSEY and M. WILMOTH )
KINSEY, d/b/a/ KINSEY FAMILY ) **2010 Opinion No. 80**
LIMITED PARTNERSHIP, )
) **Filed: July 7, 2010**
   Defendants, )
) **Stephen W. Kenyon, Clerk**
and )
)
MICHAEL BROOKBANK, )
)
   Intervenor-Appellant. )
_____ )

Appeal from the District Court of the Fifth Judicial District of the State of Idaho, Twin Falls County. Honorable Randy J. Stoker, District Judge.

The judgment of the district court is affirmed.

Jeffrey J. Hepworth, P.A. & Associates, Twin Falls, for appellant. Jeffrey J. Hepworth argued.

Merrill & Merrill, Pocatello, for respondent. Kent L. Hawkins argued.

_____

J. JONES, Justice.

   Michael Brookbank appeals the district court's grant of summary judgment in favor of Farm Bureau Mutual Insurance Company, finding that Jamey Kinsey was not covered under M. Wilmoth Kinsey's homeowner's insurance policy. We affirm.

## I.
### Factual and Procedural History

   Brookbank was injured on August 18, 2007, when he collided with Jamey's dog while riding his motorcycle. The incident occurred in front of Wilmoth's residence at 3497 East, 300

North, Kimberly, Idaho. Wilmoth is Jamey's grandmother, and he was allegedly at her residence to pick up a pair of work boots at the time of the incident. While at Wilmoth's residence, Jamey's dog jumped out of the back of his truck and ran across the road, colliding with Brookbank's motorcycle. Brookbank was seriously injured as a result. Brookbank subsequently filed suit against Jamey to recover damages arising from the incident.

Wilmoth's property is covered by a Farm and Ranch Squire Policy issued by Farm Bureau to her and the Kinsey Family Limited Partnership. Jamey is not a member of the partnership. Bodily injury and property damage claims are covered under the policy as follows:

> If a claim is made or a suit brought against any **insured** for damages of **bodily injury** or **property damage** caused by an **occurrence** to which this coverage applies, we will:
>
> 1. Pay up to our limit of liability for the damages for which the **insured** is legally liable;
>
> 2. Provide a defense at our expense by counsel of our choice.

The policy defines "insured" as:

> **Insured** means you or the entity named in the Declarations.
>
> 1. If you are an individual, **insured** also means, if residents of your household, your spouse, your **relatives** . . . .
>
> 2. If you are a partnership . . . **insured** also means your members and your partners, but only with respect to your partnership or joint venture.

The policy defines "relative" as "a person related to [the policyholder] by blood [or] marriage . . . who is a resident of [the policyholder's] household."

Based on the policy language, Farm Bureau filed this action for declaratory judgment against Jamey and Wilmoth, seeking a determination of whether the policy covered Brookbank's claim against Jamey. The parties later stipulated to Brookbank's intervention. Jamey and Wilmoth never formally appeared. After Jamey and Wilmoth were deposed, Farm Bureau and Brookbank filed cross-motions for summary judgment on the sole issue of Jamey's coverage under the policy; more specifically, whether Jamey was a resident of Wilmoth's household at the time of the accident. The district court determined that Jamey was not a resident of Wilmoth's household based on the following facts: Jamey is 38 years old and financially independent of

Wilmoth; Jamey had not stayed in Wilmoth's house since at latest 2001, other than for occasional overnight visits; Jamey normally lives at his girlfriend's house; Jamey often spends up to 30 days at a time in the hills and mountains; most of Jamey's clothing is at his girlfriend's house; testimony of Jamey and Wilmoth that Jamey is not a resident of Wilmoth's household; the lack of a bedroom for Jamey in Wilmoth's house; and the infrequent contact between Jamey and Wilmoth. Consequently, the district court granted summary judgment in favor of Farm Bureau. Brookbank appealed to this Court on the sole issue of whether Jamey is covered under the policy.

## II.
## Issue Presented on Appeal

The sole issue presented on appeal is whether the district court erred in determining that Jamey was not a resident of Wilmoth's household.

## III.
## Discussion

## A.
## Standard of Review

When reviewing the grant of a motion for summary judgment, we apply the same standard used by the district court in ruling on the motion. *Van v. Portneuf Med. Ctr.*, 147 Idaho 552, 556, 212 P.3d 982, 986 (2009). "Summary judgment is properly granted when 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Idaho R. Civ. P. 56(c)). The burden of demonstrating the absence of a genuine issue of material fact is on the moving party. *Id.* We must construe the record in favor of the nonmoving party, drawing all reasonable inferences in that party's favor. *Id.* If we find that reasonable minds could differ on conclusions drawn from the evidence presented, the motion must be denied. *Id.* "The fact that the parties have filed cross-motions for summary judgment does not change the applicable standard of review, and this Court must evaluate each party's motion on its own merits." *Intermountain Forest Mgmt., Inc. v. La. Pac. Corp.,* 136 Idaho 233, 235, 31 P.3d 921, 923 (2001).

Where the case will be tried without a jury, the district court, as the trier of fact, is entitled to draw the most probable inferences from the undisputed evidence properly before it and grant the summary judgment motion in spite of the potential of conflicting inferences. *P.O.*

*Ventures, Inc. v. Loucks Family Irrev. Trust,* 144 Idaho 233, 237, 159 P.3d 870, 874 (2007). "This Court freely reviews the entire record before the district court to determine whether either side was entitled to judgment as a matter of law and whether inferences drawn by the district court are reasonably supported by the record." *Potlatch Educ. Ass'n v. Potlatch Sch. Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010).

In those limited instances where "the evidence is entirely confined to a written record, there is no additional, in-court testimony to be obtained, and the trial judge alone will be responsible for choosing the evidentiary facts he deems most probable," the trial judge may grant summary judgment on undisputed evidentiary facts, despite conflicting inferences. *Argyle v. Slemaker*, 107 Idaho 668, 670–71, 691 P.2d 1283, 1285–86 (Ct. App. 1984). In such instances, the appropriate standard of review on appeal is equivalent to the standard of clear error prescribed by I.R.C.P. 52(a). *Flemmer v. Tammany Elementary Sch. Dist. No. 343*, 116 Idaho 204, 207 n.2, 774 P.2d 914, 917 n.2 (Ct. App. 1989). Thus, we examine the record to determine whether the trial court's decision is supported by substantial and competent evidence.

**B.**
**Policy Interpretation**

On appeal, Brookbank argues that the phrase "residents of your household" is ambiguous and that the district court should have construed the ambiguous phrase against Farm Bureau and in favor of coverage. Brookbank also argues that the evidence in the record demonstrates that Jamey was a resident of Wilmoth's household under the standard set forth in *Allstate Ins. Co. v. Mocaby*, 133 Idaho 593, 990 P.2d 1204 (1999), and *AID Ins. Co. v. Armstrong*, 119 Idaho 897, 811 P.2d 507 (Ct. App. 1991). Brookbank relies on the following facts: Jamey and Wilmoth have a close relationship, Wilmoth pays some of Jamey's bills and renews his vehicle registration, some of Jamey's mail is sent to Wilmoth's address, Wilmoth's address is listed on the accident report, and Jamey keeps some belongings at Wilmoth's home. Farm Bureau argues that the district court did not err because testimony of Jamey and Wilmoth established that they did not view Jamey as being a resident of Wilmoth's household and that Jamey resided with his girlfriend.

Because insurance policies are contracts of adhesion that are not usually subject to negotiation between the parties, any ambiguity in a policy is construed strongly against the insurer. *Mocaby*, 133 Idaho at 597, 990 P.2d at 1208. Where the language used in an insurance

4

policy is clear and unambiguous, the language must be given its plain, ordinary meaning. *Id.* Coverage will be determined according to the plain meaning of the words in the policy. *Id.* "A provision in an insurance policy is ambiguous if it is reasonably subject to conflicting interpretations." *Id.* If confronted with ambiguous language, the reviewing court must determine what a reasonable person would understand the language to mean. *Id.*

The district court in this case, much like this Court in *Mocaby* and the Court of Appeals in *Armstrong*, acknowledged that the phrase "residents of your household" is potentially ambiguous, but found that sufficient evidence was presented to demonstrate that Jamey was not a resident of Wilmoth's household in spite of any ambiguity.[1] "Whether a person is a resident of a particular place is to be determined from all the facts of each particular case, not from the facts viewed in isolation from one another." *Mocaby*, 133 Idaho at 598, 990 P.2d at 1209 (quoting *Armstrong*, 119 Idaho at 901, 811 P.2d at 511). Use of the term "resident" generally indicates "a living arrangement with some degree of permanence." *Id.* (citing *Armstrong*, 119 Idaho at 901, 811 P.2d at 511). The term "household" is generally defined "as residents who dwell under the same roof and compose a family." *Id.* (citing *Armstrong*, 119 Idaho at 901, 811 P.2d at 511); *see also* 9A PLITT, ET AL., *supra*, § 128:8. "Following the general tenets of insurance contract interpretation, these terms are given their broad meaning in cases involving the extension of liability coverage and are construed narrowly in those cases involving exclusion from coverage." 9A PLITT, ET AL., *supra*, § 128:6.

Factors used to determine whether the individuals in *Mocaby* and *Armstrong* were residents of a household included: storage of personal belongings in the named insured's household; "the presence or absence of a close continuing connection between the individual and the named insured"; maintenance of a bedroom for the individual in the named insured's household; the frequency of visits to the named insured's household; and the named insured's intent concerning the individual's residence. *Mocaby*, 133 Idaho at 598, 990 P.2d at 1209 (citing *Armstrong*, 119 Idaho at 901, 811 P.2d at 511). This list of factors is not exhaustive and no single

---

[1] The terms "resident" and "household" are often challenged as being ambiguous in insurance litigation. *See* 9A STEVEN PLITT, ET AL., COUCH ON INSURANCE § 128:6 (3d ed. 2009) ("Some courts have held that the term 'resident' is ambiguous, due to the fact that this term may be subject to various interpretations depending on the context of the case. Likewise, some jurisdictions, focusing on the term 'household,' have held that this term is also ambiguous. Other jurisdictions do not find that these terms are ambiguous on their face. However, under either circumstance, these courts recognize that a determination of whether a person is a resident of a particular household is an elastic concept entirely dependent upon the context in which the question arises.").

factor is controlling. *See* 9A PLITT, ET AL., *supra*, § 128:7. "[C]ourts will weigh a number of factors in determining whether a particular individual could be considered to have been a resident of an insured's household depending upon the specific facts of that case." 9A PLITT, ET AL., *supra*, § 128:6. Other considerations include: the amount of time spent in the household; the nature of the living arrangements; the activities undertaken in the residence; the permanence or transient nature of the individual's presence in the household; the absence of another place of residence or lodging of the individual; and the age and self-sufficiency of the individual.

In *Armstrong*, the Court of Appeals applied several of the above factors to determine that the homeowner's stepdaughter was not a resident of the household for coverage purposes. 119 Idaho at 900–03, 811 P.2d at 510–13. The liability in *Armstrong* arose from an incident where the homeowner's stepdaughter, Becky, shot another child in the eye with a BB gun, causing blindness in that eye. *Id.* at 899, 811 P.2d at 509. Becky lived with her stepparents for five years prior to the accident. *Id.* Then, three months prior to the accident, Becky was sent to live with her natural father. *Id.* Two weeks after the accident, Becky returned to her stepparents' residence. *Id.* The Court of Appeals found that, based on Becky's stated understanding that she was to permanently live with her natural father, the fact that she had taken all of her belongings with her to his house, the failure to maintain a bedroom in her stepparents' residence, her lack of visits to her stepparents' residence during her time with her father, and a lack of close connection with her stepparents, Becky was not a resident of her stepparents' household at the time of the accident. *Id.* at 901–02. The Court of Appeals made this finding in spite of the fact that Becky's natural father did not have formal custody over her and despite the fact that she returned to her stepparents' residence shortly after the accident occurred. *Id.* at 901–03, 811 P.2d at 511-13.

This Court made a similar finding in *Mocaby*. In that case, Cory Crystal shot Marjorie Upton. *Mocaby*, 133 Idaho at 595, 990 P.2d at 1206. Upton's guardian, Mocaby, tried to recover for Upton's injuries from Allstate under Crystal's grandparents' homeowner's insurance policy. *Id.* Allstate brought a declaratory judgment action against Mocaby, seeking a determination that Crystal was not a resident of his grandparents' home and, thus, not covered under the policy. *Id.* Crystal's grandparents voluntarily agreed to have Crystal live with them after being contacted by the Washington Department of Health and Welfare. *Id.* After arriving at his grandparents' home, Crystal spent two days with them and then went to Pocatello to stay with friends. *Id.* Crystal returned to his grandparents' home intermittently to shower, change clothes, and eat, but he

6

always returned to Pocatello to be with friends. *Id.* Crystal also received mail at his grandparents' home and gave the police his grandparents' address after the shooting. *Id.* at 598, 990 P.2d at 1209. This Court found that based on all the above facts, along with Crystal's stated intention not to live with the grandparents, he was not a resident of their household for policy purposes. *Id.*

Brookbank argues that this case is distinguishable from *Armstrong* and *Mocaby*. In support of this position, Brookbank principally relies on a California Court of Appeals case, *Hardware Mutual Casualty Co. v. Home Indemnity Co.*, 241 Cal. App. 2d 303 (Cal. Ct. App. 1966). Brookbank's reliance on *Hardware* is misplaced because the case is procedurally and factually distinguishable from the case at bar, as well as the previous cases decided by this Court on the issue of residence in a household. In *Hardware*, Bowens was in an auto accident while driving a car owned by his cousin, Madden, that had been stored in the garage of his uncle, Jones. *Id.* at 304–05. At the time of the accident, Jones and his wife had a family auto insurance policy that provided coverage to any relative who was using a private passenger automobile with the permission of the insured. *Id.* at 304. Relative was defined as "a relative of the named insured who is a resident of the same household." *Id.* The insurer, Hardware, refused to defend Bowens under the policy and filed a declaratory judgment action seeking a declaration that he was not a resident of the household for purposes of the policy. *Id.* The trial court found that Bowens was a resident of the Joneses' household and entitled to coverage under the policy based on the conflicting evidence presented to it. *Id.* at 305. Evidence was presented that Bowens had an apartment elsewhere and did not live with the Joneses on a permanent basis. *Id.* at 309. However, evidence was also presented that Bowens had lived with the Joneses for intermittent periods for several years, and that he often spent the night at their home. *Id.* There was also evidence that the Joneses' address was on Bowens' driver's license, that Bowens gave the Joneses' address and telephone number to the police and hospital after the accident, and that Bowens stayed with the Joneses for at least two weeks after the accident and was contacted at their home by an accident investigator. *Id.* at 309–10.

The California Court of Appeals accepted the trial court's finding that Bowens was a resident of the Joneses' household for policy purposes because that was a permissible inference from the evidence presented. *Id.* at 311. However, the finding in *Hardware* is distinguishable from *Armstrong* and *Mocaby*, as well as this case, based on the evidence presented and the

7

inferences that can be drawn from it. First, there was far more conflicting evidence presented in *Hardware* than in this case or the other Idaho cases. While the Joneses and Bowens testified that he did not live with the Joneses, there was testimony from his roommate and a great deal of circumstantial evidence that indicated that he spent more time with them than he did in his own apartment. Second, the court in *Hardware* deferred to the trial court's findings of fact.

The evidence presented in this case demonstrates that it is much more similar to *Armstrong* and *Mocaby* than *Hardware*. The reasonable inferences drawn from the facts presented in this case establish that, although Jamey sometimes visited Wilmoth's home and occasionally spent the night there, he was not a resident of her home for policy purposes. Brookbank relies on the fact that Jamey and Wilmoth have a close relationship, that Wilmoth pays some of Jamey's bills and renews his vehicle registration, that some of Jamey's mail is sent to Wilmoth's address, that Wilmoth's address is listed on the accident report, and that Jamey keeps some belongings at Wilmoth's home. However, much like *Mocaby*, the record in this matter demonstrates that any potential incidents of residence were more a matter of convenience than indicative of residency.

The record on appeal supports the district court's decision. The record before the district court was largely composed of Jamey's and Wilmoth's deposition testimony. Jamey testified that he lives with his girlfriend, Vicky Stanger, 98 to 99 percent of the time. He also testified that he occasionally visited his grandmother and sometimes slept on her couch if he was too tired to drive back to Stanger's home. In his deposition, Jamey explained that he goes on coyote hunting trips into the mountains and hills and is often gone for thirty days at a time. Jamey also explained that the reason he receives some mail at Wilmoth's address and the reason his driver's license and truck registration still list that address is because he has never bothered to change the address since the original time of registration and licensing. He notes that he does not really have an address. He also notes that he does not remember giving the police an address and would not have given them Wilmoth's despite the fact that it appears on the accident report. Further, even had Jamey given the police Wilmoth's address, the provision of a mailing address is not the same as a statement of intent to reside at that address, as this Court indicated in *Mocaby*, particularly in light of Jamey's testimony that he only uses that address as a matter of convenience. Jamey also testified that Wilmoth only handles some of his finances as a matter of convenience because of

his transient lifestyle. Finally, Jamey notes that he does not consider himself covered by the policy.

Wilmoth's testimony is consistent with Jamey's. She testified that Jamey's "home base is Hansen" where he resides with Stanger, noting that "when he considers himself home, he lives in Hansen." She also notes that she sees and speaks to Jamey infrequently, about once every few weeks, even though they are close. Wilmoth testified she thought that Jamey's mailing address was Stanger's address. Wilmoth also testified that the reason she receives some of Jamey's mail is because he has no address and some people send his mail to her home because they do not know where else to send it. Both Jamey and Wilmoth note that the bunkhouse Brookbank assumed Jamey lived in is uninhabitable and used mostly for storage and that Jamey has no established bedroom at Wilmoth's residence.

Based on this testimony, we find the district court's conclusion that Jamey is not a resident of Wilmoth's household was a reasonable inference to draw from the uncontroverted evidence in the record. Brookbank argues that the Kinseys' testimony is not entitled to great weight because it is self interested; however, Brookbank made no attempt to present additional evidence demonstrating that their testimony was untrue, even when presented with an opportunity to do so.[2] Further, the parties conceded at the close of the summary judgment

---

[2] At the conclusion of the hearing on the parties' summary judgment motions, the following exchange took place:

> THE COURT: . . . .
> From a factual standpoint from objective facts, I don't see any disputed facts in this case. It's the inferences that I draw from that, obviously, which is at issue here. Are both of you satisfied that the record is developed to the point where you are satisfied that it's there? In other words, I've got a lot of questions, but I'm not the lawyers here in this case. I have to take these cases as they come to me. I might have asked a few different questions in the depositions, but I'm not going to sit here and ask them to you in court. It's your case, not my case.
> Mr. Hawkins, are you satisfied that this case is, in fact, ripe for summary judgment; in other words, that this record is closed so that I have to make my decision based on what I have and not get into a bunch of conjectural—well I can't get into conjectural things anyhow—but are you satisfied that we're there?
> MR. HAWKINS: I'll tell you what, because I've thought about that, and obviously I read the depositions and as you always do, you kind of go, why didn't you ask a few more questions? Could we bring [Jamey] in here and cross examine him and resolve the uncomfortable questions in this case? I don't think so. I don't think we're going to get a lot more out of him. I think he'll become more adamant in his opinion, but the facts won't change. Or, they might change and it will be really complicated. So, yes, I'm comfortable submitting this to the court with the facts that we have and knowing that a cross motion has also been filed.
> THE COURT: The same question to you Mr. Hepworth?
> MR. HEPWORTH: I think [Mr. Hawkins] answered it well. I agree with him. It would be interesting. The other thing I worry about is whether we could even get him in here. He isn't the

hearing that the record before the district court was uncontroverted, meaning that the district court's sole task was to determine whether the reasonable inferences drawn from that evidence entitled either party to judgment as a matter of law. Brookbank points to the documents that list Jamey's address as Wilmoth's as evidence of his residency; however, as discussed above, there is ample evidence in the record to support the district court's finding that those documents were not dispositive. Further, the district court's decision is consistent with *Armstrong*, *Mocaby*, and *Hardware*. The district court was entitled to rely on the fact that Jamey had no bedroom on the premises, his contact with his Wilmoth was infrequent, he spent much of his time elsewhere, and neither Wilmoth nor Jamey considered Jamey to be a resident of Wilmoth's household. From this uncontroverted evidence, it is reasonable to infer that Jamey was not a resident of Wilmoth's household. Accordingly, the district court's order granting summary judgment to Farm Bureau is supported by substantial and competent evidence and is therefore affirmed.

## IV.

Because the district court's determination that Jamey is not a resident of Wilmoth's household and not entitled to coverage under the policy is reasonably supported by the record, we affirm the district court's grant of summary judgment to Farm Bureau. Costs are awarded to Farm Bureau.

Chief Justice EISMANN, and Justices BURDICK, W. JONES and HORTON CONCUR.

---

most cooperative person. I think you had a hard time getting him into my conference room to be deposed and I don't have any sense that the oath will make him any more honest than he was. I can dig up more evidence, just like Kent said, I can go dig up more, but I think we're going to get about as good a record as we're going to get.

THE COURT: Well, counsel, I am going to take this one under advisement and issue a written opinion.

As shown by this exchange, even though given the opportunity to do so, the district court and the parties viewed the record as fully developed and the facts as uncontroverted. Thus, the issue is the whether the proper inferences were drawn from the uncontroverted evidence.